FIDELITY–PHENIX FIRE INS. CO. OF
NEW YORK et al. v. BENEDICT COAL
CORPORATION.

BENEDICT COAL CORPORATION v. FI-
DELITY–PHENIX FIRE INS. CO. OF
NEW YORK et al.
Nos. 3383, 3384.

Circuit Court of Appeals, Fourth Circuit.
April 4, 1933.

Alexander H. Sands, of Richmond, Va. (Morton & Parker, of Appalachia, Va., on the brief), for appellants Fidelity-Phenix Fire Ins. Co. and others.

John W. Price and Paul Dulaney, both of Washington, D. C., for appellee Benedict Coal Corporation.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

These are two appeals from a decree entered in favor of the assured on policies of use and occupancy insurance. Actions at law were instituted to recover under the policies; but, after these had been consolidated in the court below, they were transferred to equity. Although the case is essentially one at law, in view of the fact that it was heard in equity without objection from the parties and was brought here by appeal in equity, we will review it as though it were an equity cause. Twist v. Prairie Oil & Gas Co., 274 U. S. 684, 692, 47 S. Ct. 755, 71 L. Ed. 1297. This means, however, not that we will hear it de novo, as contended by defendants, but that we will hear it as we hear any other equity appeal, under the rule that the findings of fact of the trial judge, who saw and heard the witnesses, will be given great weight and will not be disturbed unless clearly wrong. U. S. Industrial Chemical Co. v. Theroz Co. (C. C. A. 4th) 25 F.(2d) 387; Virginia Shipbuilding Corporation v. U. S. (C. C. A. 4th) 22 F.(2d) 38; Wolf Mineral Process Corporation v. Minerals Separation North American Corporation (C. C. A. 4th) 18 F.(2d) 483.

The plaintiff below was the Benedict Coal Corporation, a company engaged in operating a coal mine at St. Charles, Va. The coal property which was being operated consisted of overlying seams of coal in the side of a mountain, and prior to 1929 plaintiff had been mining two of these seams, known as seams Nos. 7 and 10; seam No. 10 being above seam No. 7. Coal was brought from the mines to the head house at the opening of No. 7, and thence was let down the side of the mountain to the tipple by means of a conveyor. At the tipple it was graded and loaded into railroad cars. The tipple, the head house, and the conveyor, therefore, were essential to the operation of the mines; and it was realized that their destruction by fire or otherwise would involve the complete interruption of plaintiff's business.

In 1927 plaintiff experienced difficulty in selling the coal from No. 10 seam, and found also that the seam was becoming thin and was being mined with difficulty on account of the character of the "roof." It was known that the coal of seam No. 12 was of superior quality and readily salable at a higher price than that of No. 10. Other companies in the neighborhood were mining coal from No. 12 successfully; but up to that time plaintiff had not located seam No. 12 on its property. In 1928 plaintiff's superintendent, one Green, began prospecting in an attempt to locate this seam for plaintiff, and his efforts proved successful. Coal of high grade, easily accessible, was found, and preliminary workings proved so promising that in 1929 it was determined to proceed with the development on an extended scale, to transfer to the working of this seam the equipment from seam No. 10, and gradually to abandon the work in No. 10 for the time being, as it was thought that the further mining of that seam might endanger the possibility of profitable mining of No. 12. It was contemplated that work in No. 10 would be discontinued about February 1, 1930. The evidence shows that as early as July, 1929, substantial quantities of coal were being taken from No. 12. In the month of August, 8,699 tons were mined from it; in September, 9,652 tons; and in October, 9,652 tons were mined prior to Oc-

tober 29th, when the mines were shut down because of the fire which occurred on that date.

Prior to commencing operations in seam No. 12, plaintiff had invested in its plant a total of something like $1,300,000, representing its investment in leases, mine equipment and development, miners' houses, commissary, etc. When the decision was made to develop No. 12, additional capital stock in the sum of $200,000 was issued to raise funds for that purpose, and approximately $187,-000 in cash was invested in the development prior to the fire. This, together with the transfer of machinery and equipment from No. 10, made a total investment of between $250,000 and $300,000 in the development of seam No. 12. Plaintiff had its buildings and equipment covered by ordinary fire insurance; but it was realized that, in view of the added investment and the prospect of profits to be derived therefrom, further protection was needed against losses which might result from interruption of business if the equipment necessary to the operation of its mines should be destroyed. The proposition of securing use and occupancy insurance was accordingly taken up by plaintiff's president with the agent of the defendant Liverpool, London & Globe Insurance Company.

This agent furnished plaintiff a work sheet to be filled out, so as to show the fixed charges and anticipated profits of plaintiff's business as a basis for determining the amount of use and occupancy insurance necessary to cover the risk. Plaintiff's president filled out this work sheet and returned it to the agent. It showed the annual fixed charges of plaintiff's business as amounting to $210,633. The anticipated net profits were not shown, but, in a letter which accompanied the work sheet, the president said:

"In regard to net profits, we have no data to go by since we are starting our No. 12 or High Splint coal in quantity production; in fact have already started it, and we expect this mine to be the most profitable of our developments in the three seams. However, we have had experience with earnings of mines in this seam, having handled in our sales organization, the Holmes-Darst Coal Company, the output of two of these mines in Harlan, being Corlew Coal Co. and the Clover Splint Coal Co. In estimating the profits we use our knowledge of these two mines and make it very low in comparison with them since only about 40% of our output will come from the No. 12 seam. In April, May and June we estimate that over and above all charges we should earn $5,000.00 monthly net

as a minimum. In July, August, and September, it should be a minimum of $10,000.-00 monthly, net, and for the remainder of the year a minimum of $20,000.00 monthly, but we expect the Benedict mines to do considerably better than that, but we give it to you as a basis for insurance."

The letter with the work sheet were submitted to the superintendent of the Liverpool, London & Globe, who wrote the agent as follows:

"From the figures which you have submitted, it is evident that the fixed charges of this concern run rather uniformly around $17,550 per month. During certain months of the year net profits amount to $5,000 per month which when added to the above figure gives a total use and occupancy value of $22,500 for that particular month. This divided by 25—there being roughly speaking 25 working days in the month—gives a per diem use and occupancy value of $900. This merely illustrates the method which can be followed in arriving at the various per diem limits to be stated in the policy and we feel that you will encounter no difficulty in properly arranging the coverage. * * * We regret to advise that we cannot handle this entire line for your good agency, however if the tipple at this mine is of steel construction, we are pleased to authorize you to bind us for 50% of the use and occupancy insurance, which according to the figures submitted with your letter, is approximately a total amount of $375,-000."

The policies as finally issued were for a total of $240,000; and they were written by an agent in Bristol, Va., who represented the Liverpool, London & Globe and the other defendants, neither of whom is shown to have had any correspondence with plaintiff about the matter. The policy of the Liverpool, London & Globe was for $50,000, that of the People's National was for $80,000, and that of the Fidelity-Phenix was for $110,000. All were the usual standard form fire insurance policies, and each bore a rider headed "Use and Occupancy," which contained, among other provisions, the following, which are the ones material for consideration here, viz.:

"(1) The conditions of this contract are that if the buildings situate on premises of assured at St. Charles, Lee County, Virginia, and occupied as coal tipple, headhouse, conveyor shed and other mining operations and/or machinery and/or equipment (Insert here 'and/or raw stock' if liability due to damage to or destruction of raw stock is to be included) contained therein, be destroyed

350

or damaged by fire occurring during the term of this policy so as to necessitate a total or partial suspension of business, this company shall be liable under this policy for the actual loss sustained consisting of: 1. Net profits on the business which is thereby prevented; 2. Such fixed charges and expenses as must necessarily continue during a total or partial suspension of business, to the extent only that such fixed charges and expenses would have been earned had no fire occurred; 3. Such expenses as are necessarily incurred for the purpose of reducing the loss under this policy; for not exceeding such length of time, commencing with the date of the fire and not limited by the date of expiration of this policy, as shall be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of said buildings and machinery and equipment (insert here 'and/or raw stock' if liability due to damage to or destruction of raw stock is included) as may be destroyed or damaged subject to the following conditions and limits, to wit:

"(2) *Total Suspension Clause*—The per diem liability under this policy during the time of total suspension of business of all the properties described herein shall be limited to the 'actual loss sustained,' not exceeding ⅓₀₀ of the amount of this policy for each business day of suspension, except that in the case of business being operated on Sundays and/or holidays, in which event the said per diem liability shall not exceed ⅓₆₅ of the amount of this policy for each business day of such suspension, due consideration in either case being given to the experience of the business before the fire and the probable experience thereafter."

As stated above, the fire occurred October 29, 1929. It destroyed the tipple, head house, and conveyor shed, and necessitated the closing down of the mines. This resulted not only in the loss of earnings from the sale of coal, but also in the loss of rents on miners' houses and profits in the operation of the commissary conducted in connection with the mine, as well as profits from sale of powder and profits from smithing. Shortly after the fire, negotiations were entered into between representatives of the plaintiff and adjusters representing the defendant companies in an effort to adjust the loss. In the course of these negotiations, figures were submitted by plaintiff on the basis of a nine months' interruption of business and a loss exceeding the total coverage of the policies for that period. The adjusters contended that there would be an interruption of only five months, and that

the loss was less than the coverage. No settlement was reached, and on January 27, 1930, an agreement was entered into submitting to arbitration the question as to the time that would be required to repair or restore the property which had been destroyed. The arbitrators filed their award on July 10, 1930, fixing the time as from October 29, 1929, to June 1, 1930.

After the submission to arbitration, plaintiff on March 31, 1930, filed sworn proofs of loss with defendants, claiming that the period of suspension would be nine months or 225 working days, and that plaintiff was entitled to the maximum amount insured under the policies or the sum of $800 per day. Attached to these proofs was a schedule showing profit on coal, based on past experience, at approximately $57,000 and estimated increase of profits amounting to $113,000. These with other items of profit and fixed charges showed a total loss for the period of $344,000, or a loss of $1,066.94 per day. Attached to this schedule was a note upon which defendants predicate their principal charges of false swearing. This note was as follows:

"Note: The item of estimated increase in net profits on coal is based on the fact that we have expended the sum of $250,000.00 in developing a high splint seam of coal known as No. 12 seam, starting production about Sept. 1-1929. This seam of coal producing a better profit than other seams mined, it would follow that our profits would have materially increased from that time on. The production has been figured not at the maximum, but is based on production that had been contracted for running through the period of suspension of operations. The detail of above figures are on file with your adjusters."

Upon denial of liability, suits were instituted; and the judge below, having consolidated the cases and heard them in equity, entered decree in favor of plaintiff for the sum of $146,400, being the full coverage of the policies, or $800 per day for 183 days. He allowed interest on this amount from September 10, 1930, that date being sixty days after the award of the arbitrators, and disallowed plaintiff's claim for return of a portion of the premiums as unearned. Defendants appealed from the decree against them, and plaintiff from that part of the decree which allowed interest only from September 10th and denied recovery of the portion of the premium which it claimed was unearned. Upon the appeal of defendants, the questions presented are: (1) Whether the policies cover the business of plaintiff in view of the

change in that business resulting from the opening of seam No. 12; (2) whether plaintiff's rights under the policy have not been defeated as a result of false swearing in the proofs of loss; (3) whether plaintiff has established loss under the policy in the amount found by the judge below; and (4) whether plaintiff is entitled to recover on the basis of 183 days, the business days which elapsed during the period of interruption, or only on the basis of days which the mine would probably have worked but for the fire. On plaintiff's appeal, the questions relate to the running of interest and the right to recover the allegedly unearned portion of the premiums.

### Change in Business.

One of the principal contentions of defendants is that the opening of seam No. 12 constituted such a change in plaintiff's business that the policies issued had no application to it, being issued to cover a business the experience of which related to mining seams Nos. 7 and 10. Their argument, in effect, is that the purpose of use and occupancy insurance is to insure the earnings of an established business, the earnings of which can be determined by experience, and that, when such a change is made in the business as will nullify the probative force of experience, the policy itself is nullified.

We are not impressed with this contention as applied to the facts here. It may well be that a change in business of such a radical nature as to make it entirely different from that which was insured by use and occupancy or "business interruption" insurance would avoid the policy, or rather render it inapplicable to the risk, on the principle that the parties did not contract with reference to the business resulting from the change. This principle is applied in the somewhat analogous case of bonds guaranteeing the performance of contracts but permitting additions to and alterations of the work to be performed, where there is a complete departure from the original contract and the undertaking of an independent enterprise. See Maryland Casualty Co. v. City of South Norfolk (C. C. A. 4th) 54 F.(2d) 1032, and cases there cited. We think, for instance, that a use and occupancy policy on a warehouse would not be held to cover the loss of profits of a cotton factory which the owner might begin operating in the warehouse after the issuance of the policy. But the evidence here discloses no such radical change in the business of plaintiff. That business was the mining and sale of coal; use and occupancy insurance was

sought on the head house, tipple, etc., because it was realized that the destruction of these would interfere with that business; and it is precisely that business which has been interrupted by their destruction.

The business of plaintiff involved many factors other than the getting out of coal from the seams in the side of the mountain. Valuable machinery and equipment had been installed; a business organization had been built up; a force of miners had been gathered in a village built for their accommodation; a sales organization had been developed; and a demand for the coal produced by the mine had been established. In such a situation, the further development of one seam of coal and the abandonment of another found to be unprofitable is in no sense a radical or revolutionary change in the business; and, even though it may greatly increase profits, it does not render valueless the experience of the business in estimating what profits are to be anticipated. We see no reason why, with the knowledge of the cost of getting out the coal from the new seam, which must be acquired as the work of opening up progresses, profits cannot be estimated in the light of the experience of the business as well as if the change had not been made. We do not apprehend that a use and occupancy policy on a shoe factory would be avoided because improved machinery had been installed to care for a part of the process of manufacture; nor a policy on a lumber plant, because the owners had begun operating in a different tract of timber. Forfeitures are not favored either at law or in equity; and, if insurance companies intend that use and occupancy policies shall be avoided because of such changes, they should insert conditions to that effect in their policies.

That the change now relied on was not deemed material before loss is shown by the fact that the Liverpool, London & Globe was advised of the opening of seam No. 12 and the hope of increased profits to result therefrom, and, instead of suggesting that this was a reason for not issuing the policy, it wrote its agent suggesting that plaintiff was entitled to insurance in the sum of $375,000. It does not affirmatively appear that the other defendants had the information furnished the Liverpool, London & Globe; but they either acted on this or without information, being satisfied to guarantee the profits of plaintiff's business for the premiums involved, without making inquiry either as to past experience or future hopes. In either situation, they are hardly in position to say that the risk was different from that contemplated by them.

352

### The Defense of False Swearing.

The contentions of defendants with respect to false swearing in the proofs of loss are: (1) That plaintiff claimed for nine months' interruption of business when it had an offer to reconstruct the tipple in 5½ months and did not disclose the fact; (2) that it was falsely stated that $250,000 had been expended in developing mine No. 12; (3) that it was stated that production started in seam No. 12 about September 1, 1929, whereas it was not to start until the following February; and (4) that the production as set forth in the proofs was falsely stated to be "based on" production that had been contracted for. We agree with the judge below that these contentions are without substantial merit. It should be remembered that, before the proofs of loss were filed, the adjusters of defendants had been on the scene, had had access to plaintiff's books and records, had discussed fully with plaintiff's representatives all of the questions involved, had endeavored to arrive at a compromise, and, failing in this, had submitted to arbitration the question of the length of the period of suspension. Under such circumstances it is hardly believable that the statements to which exception is taken could have been made with any intent to deceive or defraud. The patent futility of attempting such a thing should be, of itself, almost sufficient to satisfy a reasonable mind that no such intent existed.

In addition to this, we think that the evidence shows the statements to be substantially true. The statement as to the period of suspension was, of course, an estimate. The fact that a contractor had offered to rebuild the tipple in less time is not conclusive of the time required, and plaintiff was manifestly not required to revise its estimate because of the offer. The statement as to the cost of developing No. 12 was true when consideration is given to the value of the machinery transferred as well as to cash expended. The statement that production commenced in No. 12 on September 1st was incorrect only in that it placed the date too late; for the evidence shows that substantial production began as early as July. The contention of plaintiff as to the statement that estimated production was based on production which had been contracted for is that, while its entire production during the period of suspension was not covered by contracts, it was true that its production as figured was based on contracts which it had. Plaintiff says that the production of its mine was limited by its ability to dispose of nut and slack coal, and that it had contracts covering nut and slack in an amount which justified the estimate of production contained in the schedule. While we think that the statement might easily mislead, we do not think that we would be justified in holding that it was willfully false or made with intent to deceive.

There is no question, of course, but that intentional false swearing in proofs of loss in an attempt to defraud the insurance company will avoid a policy of insurance. Columbian Ins. Co. v. Modern Laundry (C. C. A. 8th) 277 F. 355, 20 A. L. R. 1159, and cases there cited. But forfeitures are not favored; and, to warrant a court of equity in decreeing forfeiture on such ground, the intentional false swearing must be established by evidence "clear, unequivocal and convincing." See Missouri State Life Ins. Co. v. Guess (C. C. A. 4th) 17 F.(2d) 450. We clearly would not be justified in reversing the finding of the trial judge on this issue of false swearing, especially in view of the fact that he had the witnesses before him, and was able to observe their demeanor and expression while on the witness stand and to judge of their motives as well as their veracity better than we possibly can from reading the cold pages of the record.

### The Amount of the Loss.

We have heretofore quoted the applicable provisions of the policies as to losses covered. The matter involved is not compensation for destruction of physical property, but for loss of earnings due to the interruption of business resulting from such destruction. The policies cover loss of profits on the business thereby prevented, fixed charges and expenses which continue and which would have been earned if the business had not been interrupted, and expenses necessarily incurred in reducing the losses under the policy; but, in this case, only the first two of these items are involved. The purpose of this form of insurance is to indemnify the assured against losses arising from the interruption of business by fire or other catastrophe insured against; and lost profits and fixed charges and expenses which continue and which would have been earned if the business had gone on are the losses naturally arising from such interruption. We think it clear that such losses are to be determined in a practical way, having regard to the experience of the business before the fire and its probable experience thereafter, without being confined to the basis upon which books are kept for income tax purposes or for dealings with stockholders. Hutchings v. Caledonian Ins. Co. (D. C.) 52 F.(2d) 744; Pu-

get Sound Lumber Co. v. Mechanics' & Traders' Ins. Co., 168 Wash. 46, 10 P.(2d) 568.

We agree with the learned judge below that, in estimating the profits lost by this plaintiff, there should be included the lost profits of its commissary, the loss of profits from smithing and sales of powder to miners, and the loss of profits derived from rental of miners' houses. These were losses directly resulting from the destruction of the head house, tipple, and conveyor; for the businesses from which these lost profits were derived were not separate from the business of mining, but were shown to be an integral and necessary part of that business. Cf. Brogan v. National Surety Co., 246 U. S. 257, 263, 38 S. Ct. 250, 62 L. Ed. 703, L. R. A. 1918D, 776. To carry on the business of mining as it was carried on by plaintiff, it was necessary for plaintiff to furnish houses to its employees, to provide a commissary to furnish them supplies, to furnish them powder for their work and mechanics to repair their tools. Profits were derived from these enterprises, but they were in reality nothing but a part of the profits of the mining venture. They would not have been entered upon but for it; and it could not have been carried on very well without them. When the mines were shut down as a result of the destruction of the tipple, plaintiff suffered loss of profits from its mining venture with respect to these activities as well as with respect to the sales of coal; and we fail to see upon what principle such losses could be excluded from the coverage of the policies. The policies did not insure the coal tipple, the head house, or the conveyor, nor in express terms the profits from sales of coal which might be prevented by their destruction. The undertaking was to indemnify plaintiff for losses of profits and fixed charges resulting from the destruction of these instrumentalities; and the losses in the profits of the commissary and other activities mentioned resulted from their destruction just as truly as did losses of profits from sales of coal. The net profits on such activities were "thereby prevented," to use the language of the policies. The case of Gatliff Coal Co. v. Lucas, 59 App. D. C. 141, 36 F.(2d) 545, is not in conflict with the conclusion here reached. That case merely held that, for income tax purposes, depletion should not be allowed on a commissary conducted in connection with mining operations.

And we agree also that the item of loss resulting from the intended closing of the mine in seam No. 10 is not to be deducted from profits. The profits which the policies guarantee are those which would have been earned above immediate cost of production and fixed charges if the business had not been interrupted; and the fact that the company sustained a loss due to closing down an unprofitable venture would not diminish the profits realized from carrying on a venture that was profitable. The fact that such loss might have been entered on the books, or that credit might have been taken for it in tax returns, is beside the point. The question is, Did it diminish the profits of the business which was prevented by the fire? It is perfectly clear that it did not.

And we agree with the learned judge in his dealing with depreciation and depletion under the heading of fixed charges. Depreciation on property which has been destroyed is not to be allowed as a fixed charge, even though it must be considered in estimating profits which would have been earned if the business had gone on; for manifestly property which has been destroyed cannot depreciate. Likewise depletion is not ordinarily to be allowed as a fixed charge in computing the loss under the policy; for ordinarily when the business stops depletion stops.

We think that the principles which we have just discussed have been correctly applied to the facts of the case, and that the finding that plaintiff has suffered loss in the amount of the maximum coverage of the policies for the period of suspension fixed by the arbitrators is amply sustained. The evidence supports the conclusion that plaintiff could have sold the product of its mine at the prices for which it contends, that it could have produced the volume contended for, and that the cost of production relied on was in line with its experience. Defendants strenuously urge that the estimated profits from No. 12 are too large, contending that, in the operations in that seam upon which the estimates are based, certain expenditures have been charged to capital account which should have been charged to expense. We agree with the judge below, however, that the evidence shows that these expenditures have been properly allocated. It is well settled that during the developmental stage of a mine many expenditures, which later would be charged to expense, should be charged to capital. See Marsh Fork Coal Co. v. Lucas, Com'r (C. C. A. 4th) 42 F.(2d) 83, and authorities there cited. The allocations to capital of which defendants complain were made in good faith before the fire occurred; and a comparison of the costs of mining No. 12 with those incurred in mining the seams al-

ready developed shows that the charges complained of are in line with experience and not made with a view of showing excessive profits in the new seam.

■ The trial judge, after accepting plaintiff's figures and estimates as correct, reduced the estimated profits on sales of coal 50 per cent. in making his own computation and adopted a figure of $59,261.05 (after allowing for items of depreciation and depletion which plaintiff had failed to include in cost and deducting for demurrage and adjustments on sales). This, with the lost profits from the commissary, rentals, sales of powder and smithing, brings the total loss of profits for the period of suspension to $78,-110.05. This figure would seem to be conservative, in view of the fact that plaintiff had been earning heavy fixed charges and a small profit while operating the unprofitable seam No. 10, and that its experience had shown that it could earn substantial profits from the superior grade of coal which it was obtaining from No. 12. And we think that this estimate of increased profits from No. 12 is not a mere vagary of the imagination conjured up by plaintiff for the benefit of this lawsuit. So convinced were plaintiff's stockholders of its reality that they invested $200,-000 in stock of the company in order that the development might be undertaken; and so impressed were its officers with the results of the development that they were willing to discontinue the work in No. 10 to further it.

The finding that profits were earned necessarily implies the earning of fixed charges; for there can be no profits until fixed charges are taken care of. The only questions relating to fixed charges, therefore, are whether the items which the judge below included in his estimate of $88,702.92 were properly included. We think that they were. In arriving at this figure, the judge reduced the item of depreciation as claimed by plaintiff $3,-111.08, so as to eliminate depreciation on the property which had been destroyed by fire. He also eliminated a large number of items, some of which might properly have been held to be fixed charges, but which need not be considered in view of the fact that the loss found exceeds the maximum of the insurance coverage. In this connection, it is worthy of note that, at the time of applying to the agent of the Liverpool, London & Globe for the insurance, plaintiff showed on its work sheet annual fixed charges of $210,633, including depreciation of $105,119, which was not objected to as excessive. It is quite significant, also, that defendant's expert filed an estimate of fixed charges and expenses amounting to $12,903.74 per month, or a total of $90,326.-18 for the seven months' period, which is greater than the amount found by the judge.

The controversy over profits and fixed charges involves many items which it is not practical to discuss in detail in an opinion of any reasonable length. We have given full consideration to the contentions of defendants as to all of these matters, however; and we are satisfied that any errors against them in the figures adopted by the court below are more than compensated for by the elimination of matters which might properly have been included in his estimate. If, for instance, to the item of $88,702.92 for fixed charges, which is undoubtedly conservative, there be added merely the full estimated loss of profits from the commissary, rentals, smithing, and sale of powder (which there is no occasion to halve), we have a total of $126,403.87, which is only $20,000 less than the coverage of the policies. Certainly, under any theory which the evidence in the case would permit, profits on sales of coal would have been largely in excess of this amount.

■ Contention is made that plaintiff is estopped by its proofs of loss, the estimates of which are made upon a different basis in a number of particulars from the estimates relied upon at the trial. In view of the fact that the proofs of loss submitted by plaintiff were for the full amount of the insurance coverage, there would seem to be little point in this contention. If what is meant is that the court cannot consider upon the trial any proofs which vary from the statements in the proofs of loss, the position is not sound. As we said in the case of First Nat. Bank v. Glens Falls Ins. Co. (C. C. A. 4th) 27 F. (2d) 64, 70: "The proofs of loss are not part of the contract of insurance. The contract requires them to be made, but when made they are the mere declarations of the insured, admissible in evidence as such, but not conclusive of the facts which they state. If they contain false statements, upon which the company relies, and so acts or refrains from acting that injury would result therefrom if the statements were denied, an estoppel in pais may arise. 26 C. J. 381, and cases cited. But no such estoppel arises in ordinary cases of erroneous statements in proofs of loss, where the company is not induced thereby to admit a liability which it would not have admitted or otherwise misled into changing its position."

### Limit of Recovery.

■ We agree with the trial judge that the plaintiff is entitled to the $800 coverage

of the policies for the 183 days which elapsed between November 1, 1929, and June 1, 1930, exclusive of Sundays and holidays. The coverage of the policies is the "actual loss sustained," not exceeding ⅟₃₀₀ of the amount of the policy for each business day of suspension. The suspension as found by the arbitrators was for the period above stated, and the loss exceeded the maximum coverage. We think that the limitation refers to the business days included in the period of suspension so found, and not to the probable days that the mine would have operated during the period of suspension if same had not occurred. The days during which the mine would have operated must be estimated, of course, in estimating production for determining profits, and this is a practical limit on recovery to profits on business which could have been done on days when the mine would have worked; but, in addition to this, there is the per diem limit which restricts the liability to so much per day for the period of suspension. Fixed charges and depreciation continued, and the work of the sales department and the clerical force went forward, whether the mine tipple was working or not; and it could not have been intended that these policies, which were to guarantee fixed charges, expenses, and profits earned, were intended to limit reimbursement merely to those of the days of suspension in which the tipple would probably have been working.

### Interest.

The court below allowed interest on the recovery from September 10, 1930, which was sixty days after the filing of the report of the arbitrators. We think that this was correct. The provision of the policy as to when the loss was payable is as follows:

"The amount of loss or damage for which this company may be liable shall be payable sixty days after proof of loss, as herein provided, is received by this company and ascertainment of the loss or damage is made either by agreement between the insured and this company expressed in writing or by the filing with this company of an award as herein provided."

Under this language the amount due under the policy was not due upon loss, but sixty days after receipt of proofs of loss and ascertainment of the loss. Where, as here, there was an arbitration, it was not payable until sixty days after the award. Interest, of course, would not run until the loss was due and payable; and we think that the

judge below properly fixed this date as September 10th. Defendants claim that it would not begin to run even then, contending that only liquidated claims bear interest and that the claim of plaintiff was not liquidated and did not become liquidated until the decree below was entered. The answer to this is that this is not a suit for damages, but for the amount due under contracts; and plaintiff is entitled to a recovery that will place it in the position that it would have occupied if the contracts had been complied with. American Iron Co. v. S. A. L. Ry. Co., 233 U. S. 261, 265, 34 S. Ct. 502, 58 L. Ed. 949. The contract of defendants under their policies was not to pay losses after a court had determined their amount, but to pay them in sixty days after the filing of the award of arbitrators, if arbitration should be required. If they had complied with their contracts, they would have paid plaintiff the full coverage of the policies not later than September 10th; and plaintiff must have interest from that date if it is to receive the full compensation to which it is entitled. It is true that the claim of plaintiff for the full coverage under the policies was disputed by defendants, even though the period of suspension was determined by the arbitrators; but the evidence discloses that the defendants were in the wrong in that dispute, and that the amount due plaintiff was the full coverage of the policies. Under such circumstances, we know of no reason why interest should not be awarded covering the period that defendants have withheld the money which under their contracts should have been paid to plaintiff.

If the awarding of interest under such circumstances were a matter of discretion, as in the case of unliquidated damages, it is clear that the award of the judge below was a proper exercise of that discretion. Concordia Ins. Co. v. School District No. 98, Payne County, Okl., 282 U. S. 545, 554, 51 S. Ct. 275, 75 L. Ed. 528; Miller v. Robertson, 266 U. S. 243, 257, 258, 45 S. Ct. 73, 69 L. Ed. 265. The period of suspension had been definitely settled by the arbitration, defendants had been accorded access to plaintiff's books and records and had had ten months to determine the amount of loss. Instead of tendering some amount as admittedly due and offering to pay it without prejudice, they denied all liability, and have thus delayed settlement for an additional period of more than two years. In equity and good conscience they should pay interest for the time that settlement has been withheld.

## Unearned Premiums.

▮ The argument of plaintiff relative to return of unearned portion of premiums paid is without merit. Even if the statute relied upon (Virginia Code, § 4306) were held to have application to policies of use and occupancy insurance, plaintiff could not recover under it, for the reason that the amount ascertained to be due was not "less than the amount upon which the premium was paid," but the full coverage of the policies. We agree, however, with the judge below, that this statute was not intended to have, and does not have, relation to use and occupancy insurance.

For the reasons stated the decree appealed from will be affirmed on both appeals:

Affirmed.