**WOOD GOODS GALORE, INC., Appellant,**

v.

**REINSURANCE ASSOCIATION OF MINNESOTA, Respondent.**

Nos. C1-91-682, C9-91-901.

Court of Appeals of Minnesota.

Dec. 3, 1991.

Review Denied Jan. 30, 1992.

Michael D. Klampe, Michael Klampe & Associates, Rochester, for appellant.

Kirby Dahl, Mark McKeon, Willenbring, Dahl, Wocken & Zimmermann, Cold Spring, for respondent.

Considered and decided by FOLEY, P.J., FORSBERG, Judge, and KALITOWSKI, Judge.

## OPINION

FORSBERG, Judge.

Appellant Wood Goods Galore, Inc. (Wood Goods) brought this declaratory judgment action against respondent Reinsurance Association of Minnesota (RAM) to determine coverage under a business operation insurance policy following a fire at Wood Goods' manufacturing facility in

Chester, Minnesota. Following trial, the court concluded Wood Goods was entitled to $80,000 in coverage for personal property loss; to coverage for business interruption loss at its retail store in Rochester, Minnesota, but not from its store in La-Crosse, Wisconsin; and to reasonable attorney fees under Minn.Stat. § 555.08 (1988). The court subsequently denied both parties' motions for post-trial relief, and awarded Wood Goods attorney fees of $20,-000.

Wood Goods appeals the issue of the extent of the business interruption loss coverage, while RAM has filed a notice of review on the issues of attorney fees, personal property loss coverage, and business interruption loss coverage. We affirm in part, reverse in part.

## FACTS

Wood Goods is owned by Timothy Logan and Timothy Ziebell. It manufactures wood furniture at a facility located on property in Chester which is being purchased from Logan's father, Raymond Logan.

Wood Goods also sells furniture. In 1987, no furniture was sold from Chester. Wood Goods operated two retail stores, one in Rochester and the other in LaCrosse, which sold furniture manufactured at Chester. Approximately 60% of what was sold out of Rochester was manufactured at Chester, and approximately 70% of the sales from LaCrosse were manufactured at Chester. While approximately 40% of the furniture manufactured at Chester was sold to other furniture retailers or to commercial businesses, all sales were still arranged through the Rochester or LaCrosse store.

In August 1987, Wood Goods' three properties were insured under different policies with different companies. Chester was insured under a policy issued by RAM and purchased through the Al Heartman Insurance Agency. The policy named Raymond and Lorraine Logan as the insureds, provided $40,000 in business personal property loss coverage, and included coverage for business income or business interruption loss. Rochester was insured under a dif-

ferent policy through another insurance agency. LaCrosse was insured by a Wisconsin agency under a State Farm policy that provided $45,000 in business personal property loss coverage.

During 1987, Woods Goods applied for an extended line of credit with Norwest Bank in Rochester. Ziebell and Logan both testified their negotiations were finalized at a meeting with the bank's representative on September 30, 1987. A Letter of Understanding (Letter) dated September 30 sets out the terms underlying the issuance of this line of credit. The Letter indicates the loans are secured by "all inventory, accounts receivable, and equipment of all stores." It further states Wood Goods agrees to "[m]aintain hazard insurance in an amount not less than the outstanding balance of indebtedness to the bank on collateral pledged to the bank."

One of the financial statements referred to in the Letter was introduced at trial, and indicates that as of August 31, 1987, Wood Goods had inventory and equipment worth over $200,000. Ziebell testified the inventory and equipment at Chester alone totalled over $80,000.

Logan and Ziebell claim that immediately after the September 30 meeting with Norwest, they met with Al Heartman at his office to review their coverage and obtain the insurance required by Norwest. Heartman denied meeting with Logan and Ziebell on September 30, and testified he was on vacation. Logan and Ziebell nevertheless insist they met with Heartman sometime around September 30, and that they requested $40,000 additional coverage on Chester and $80,000 coverage on Rochester.

A binder was introduced at trial dated September 30, which provides $80,000 in personal property coverage on Rochester but only $40,000 on Chester. A former employee of the Heartman Agency, Carol Houfer, testified she prepared the binder at the request of Logan and Ziebell, who came into the office. She stated Heartman was not present at the meeting. Houfer testified Logan and Ziebell "wanted to add $80,-000 coverage at [Rochester] for contents."

She further testified there was no discussion of coverage for Chester and "that [the binder] was to show $40,000 at Chester, not an additional $40,000."

A memo dated October 13 from Houfer to RAM was introduced at trial. In that memo, Houfer requests that the named insured on the policy be changed from Raymond and Lorraine Logan to Wood Goods, that the Rochester location be added with contents coverage of $80,000, and that the contents coverage at Chester remain at $40,000.

On November 7, 1987, a fire occurred at Chester. Heartman testified he did not see Logan and Ziebell until November 10, three days after the fire. Heartman further testified it was at this meeting he first learned of Wood Goods' request for $80,000 in personal property loss coverage for Chester. In a note he made of the meeting, Heartman indicated the coverage on Chester should be changed from $40,000 to $80,000, effective November 10.

After this November 10 meeting, the Heartman Agency sent a letter to Cindy Baker in RAM's underwriting department. In response, Baker issued a declaration sheet dated November 25. This declaration sheet shows an effective date of October 16, and lists Chester as having $80,000 in business personal property loss coverage. However, Baker testified she would not have issued the declaration sheet had she known about the November 7 fire, and the issuance was an error on her part.

The trial court concluded Wood Goods was entitled to $80,000 in personal property loss coverage on Chester, to coverage for business interruption loss stemming from Rochester but not from LaCrosse, and to reasonable attorney fees under Minn.Stat. § 555.08. Both parties appeal.

## ISSUES

1. Did the trial court err in declaring Wood Goods entitled to $80,000 in personal property loss coverage?

2. Did the trial court err in declaring Wood Goods entitled to coverage for losses stemming from its Rochester store but not from its LaCrosse store?

3. Was the trial court's award of $20,000 in attorney fees proper?

## ANALYSIS

### I.

The trial court concluded that on the date of the fire, Wood Goods' insurance policy provided $80,000 in coverage for business personal property loss. In so doing, the court found that on or about September 30, 1987, Logan and Ziebell requested $80,000 in coverage on Chester from the Heartman Agency; and that the Heartman Agency mistakenly issued a binder providing only $40,000 in coverage.

RAM frames the issue as whether the trial court erred in allowing reformation of the contract. In denying both parties' post-trial motions, the trial court expressly rejected RAM's reformation argument, reasoning there is no need to reform the contract because "I have concluded that the contract was made at the time Al Heartman agreed to provide the necessary coverage, and that at that time the parties agreed to $80,000 as the amount."

The trial court's analysis assumes a new contract was formed when Wood Goods requested, and the Heartman Agency agreed to, $80,000 in coverage on Chester. However, the contract in effect at the time of the fire consisted of the original policy, which was issued to Raymond and Lorraine Logan, and the September 30 binder. Essentially, Wood Goods' claim is that the binder fails to embody the real agreement of the parties, and that this failure was due to the mutual mistake of the parties. The proper remedy in such a case is reformation.

Where an agent has allegedly made a mistake in obtaining insurance, the insured's remedy is generally reformation of the contract. *See Keogh v. Sharon Township Mut. Fire Ins. Co.*, 195 Minn. 575, 263 N.W. 601 (1935) (insured entitled to reformation of contract where evidence showed parties intended to insure hog house which was omitted from policy only through mu-

tual mistake); *Mahoney v. Minnesota Farmers' Mut. Ins. Co.*, 136 Minn. 34, 161 N.W. 217 (1917) (where written contract of insurance contains incorrect description of land, court will reform contract to conform to oral agreement of parties). A party seeking reformation of a contract has an "onerous" burden of proof. *Tollefson v. American Family Ins. Co.*, 302 Minn. 1, 7, 226 N.W.2d 280, 284 (1974). Where reformation is based upon mutual mistake, as it is here because there is no evidence or allegation of fraud or inequitable conduct, the evidence "must be clear, precise, and convincing." *Id.* (quoting *Glaser v. Alexander*, 247 Minn. 130, 137, 76 N.W.2d 682, 686 (1956)).

■ The issue in this case becomes whether the trial court clearly erred in finding that Logan and Ziebell requested $80,000 in coverage on Chester on or about September 30. Logan and Ziebell's testimony on this issue is supported by Norwest's requirement that they obtain hazard insurance coverage in amounts sufficient to cover their debt, which totalled over $200,000. Wood Goods would only meet its obligation to Norwest if it had requested $80,000 in coverage on Chester, which when combined with its $80,000 on Rochester and $45,000 on LaCrosse, would total $205,000. If Wood Goods requested only $40,000 on Chester, then it would not have been in compliance with its Norwest Agreement.

Logan and Ziebell's testimony is further supported by the November 25 declaration sheet which stated Wood Goods had $80,000 in coverage on Chester effective October 16. While RAM employee Baker claimed this declaration sheet was issued erroneously, the trial court nevertheless chose to accept the declaration sheet as confirmation of the earlier agreement between Wood Goods and the Heartman Agency.

RAM argues the testimony of Logan and Ziebell was contrary to the testimony of Houfer and Heartman. However, due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses. Minn.R.Civ.P. 52.01. While testimony as to dates conflicts, the exact date of the meeting is not crucial. The trial court merely found the parties met "on or about" September 30. Nor is it crucial to determine whether Logan and Ziebell met with Houfer or Heartman prior to the fire. The trial court found Logan and Ziebell met with someone from the Heartman Agency. These findings are sufficient to support the conclusion that reformation of the contract is warranted due to mutual mistake of the parties.

RAM further insists Logan's testimony was seriously impeached several times during trial. However, Logan was able to rehabilitate his testimony on rebuttal.

RAM finally argues the documentary evidence does not support Logan and Ziebell's claim that they requested an additional $40,000 in coverage on Chester prior to the fire. All the memos between RAM and the Heartman Agency after the September 30 meeting request $40,000 in coverage for Chester. However, these memos are all based on what the trial court found was a mistake, i.e. that the Heartman Agency issued a binder for only $40,000 in coverage on Chester when $80,000 in coverage had been requested. In addition, the November 25 declaration sheet tends to support the testimony of Logan and Ziebell.

Under these circumstances, we cannot conclude the trial court clearly erred in finding the Heartman Agency mistakenly issued a binder providing only $40,000 in coverage on Chester when $80,000 in coverage had been requested. The contract may therefore be reformed to provide $80,000 in personal property coverage on Chester.

## II.

The trial court concluded the policy issued by RAM provided coverage for business interruption losses for products manufactured at Chester which would or could have been sold at Rochester. However, the court refused to interpret the policy as covering lost sales at LaCrosse. Both parties appeal this issue.

■ The purpose of coverage for business interruption loss is to do for the business what it would have done for itself had

no loss occurred. *Great N. Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 303 Minn. 267, 272, 227 N.W.2d 789, 793 (1975) (quoting *A & S Corp. v. Centennial Ins. Co.*, 242 F.Supp. 584, 589 (N.D.Ill.1965)). Depending upon the language of the particular policy, such coverage is not necessarily site specific. Where operations are found to be interrelated and interdependent, mutually dependent, or vertically integrated, courts have not confined the recoverable loss to the particular property that was damaged. *See, e.g., Nat'l Union Fire Ins. Co. v. Anderson–Prichard Oil Corp.*, 141 F.2d 443, 446 (10th Cir.1944) (losses to pipeline company considered business interruption loss where fire at oil refinery caused decline in amount of oil that pipeline company was able to ship from refinery); *Fidelity–Phenix Fire Ins. Co. v. Benedict Coal Corp.*, 64 F.2d 347, 353 (4th Cir.1933) (losses suffered by mining company providing support services to coal miners covered when fire at coal mine halted production), *cert. denied*, 289 U.S. 762, 53 S.Ct. 795, 77 L.Ed. 1505 (1933).

■ The policy issued in this case provides for "loss of business income" and states in pertinent part: "If **your** business operations or occupancy are necessarily interrupted because of direct physical loss of or damage to real or personal property at the described premises, **we** will pay **your** actual loss or earnings." It further defines earnings as "actual net profit * * * normally earned by **your** business."

The trial court in this case found that the manufacturing and sales portions of Wood Goods' business were dependent on each other. The court further recognized that under the usual interpretation of business interruption coverage, Wood Goods would be entitled to recover for losses suffered at both retail stores. The court nevertheless went on to examine whether the parties intended to limit the right to recover in this instance.

■ However, the intent of the parties to a contract becomes relevant only when the contract language is ambiguous or reasonably subject to more than one interpretation. *Columbia Heights Motors, Inc. v.*

*Allstate Ins. Co.*, 275 N.W.2d 32, 34 (Minn. 1979). We believe the policy language in this case is clear, and broad enough to cover losses stemming from both retail stores. Wood Goods is therefore entitled to recover any loss of actual net profit it can prove were directly caused by the fire at its manufacturing plant in Chester, whether those losses occurred at its Rochester or at its LaCrosse retail store.

### III.

■ The trial court concluded Wood Goods is entitled to an award of $20,000 in attorney fees pursuant to Minn.Stat. § 555.08 (1990). The supreme court has since held that an insured is not entitled to attorney fees and costs under that statute which are incurred in bringing a declaratory judgment action to establish coverage. *See Garrick v. Northland Ins. Co.*, 469 N.W.2d 709, 713–14 (Minn.1991). Wood Goods is therefore not entitled to an award of attorney fees.

### DECISION

We affirm the trial court's determination that Wood Goods is entitled to $80,000 in business personal property loss coverage on Chester, and its determination that Wood Goods is entitled to business interruption losses stemming from Rochester.

We conclude Wood Goods is also entitled to business interruption losses stemming from LaCrosse, and reverse the trial court's determination on that issue.

The trial court's award of attorney fees to Wood Goods is reversed.

Affirmed in part, reversed in part.