**GENERAL INS. CO. OF AMERICA v. PATHFINDER PETROLEUM CO.**

**PATHFINDER PETROLEUM CO. v. GENERAL INS. CO. OF AMERICA.**

No. 10494.

Circuit Court of Appeals, Ninth Circuit.

Aug. 29, 1944.

As Amended on Denial of Rehearing
Oct. 30, 1944.

W. O. Schell and Gerald F. H. Delamer, both of Los Angeles, Cal., for appellant General Ins. Co. of America.

George Penney, Jean Wunderlich, and Earl Glen Whitehead, all of Los Angeles, Cal., for appellant Pathfinder Petroleum Co.

Before GARRECHT, DENMAN, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

The General Insurance Company of America, hereinafter called the insurer, appeals from a judgment of the district court awarding $30,327.57 as a loss for which it held insurer liable upon a use and occupancy policy insuring Pathfinder Petroleum Company, hereinafter called the insured, against its loss of "net profits of the business" and certain fixed charges which were occasioned by a fire destroying insured's plant for the manufacture of gasoline. The insured appeals from the same judgment which awarded only a portion of the fixed charges and expenses claimed by it under a provision of the policy insuring such charges and expenses during the period of loss of use and occupancy caused by the fire. The physical loss from the fire was insured in a separate policy with which we are not here concerned.

### The Insurer's Appeal.

The policy provision in question, customarily issued in this class of insurance, is clear and direct in its terms. The policy covered the "actual loss sustained" during a ninety day period of suspension by fire of the use and occupancy of insured's gasoline refining plant "consisting of: Item I. The net profits on the business which is thereby prevented: * * *."

The problem presented to the insured to sustain its burden of proof of the loss of net profits ordinarily consists of determining (a) the total cost, including depreciation,[1] of manufacturing the merchandise the production of which is prevented during the period of the use and occupancy coverage—in this case ninety days—and, (b) the price at which the product would have been sold in that period, either by prior sales agreement or the current market price in the absence of such commitments. The manufacturing cost is ordinarily shown by the prior experience of the plant in producing the merchandise. The prior sales price may or may not be relevant. It may be of no value if the actual sales price may be shown either by prior commitment or the market price current during the period of prevented production covered by the insurance and the prior sales experience show no logical connection with the sales price during the suspension period.

Instead of making proof in the method customary to business, the insured offered different evidence. The reason is obvious. Insured's plant began its operations on January 1, 1940. It was destroyed by fire on August 31, 1940. Its average cost of producing gasoline in the eight months was 4.608 cents per gallon. During the first five months the average sales price per gallon rose steadily, as follows:

| Month | Price received per gallon in cents |
| --- | --- |
| January | 6.485 |
| February | 6.561 |
| March | 6.671 |
| April | 7.014 |
| May | 7.203 |

There was a substantial drop in the sales price for the succeeding three months to the fire, as follows:

| | |
| --- | --- |
| June | 6.467 |
| July | 6.171 |
| August | 5.973 |

Again it dropped during the three months of the ninety days of the coverage to

| | |
| --- | --- |
| September | 6.177 |
| October | 6.146 |
| November | 5.928 |

The average sales price for the three periods was as follows:

| | |
| --- | --- |
| January-May inclusive | 6.787 |
| June, July, August | 6.203 |
| September, October, November—the suspension period | 6.084 |

The average profits per month for the second period dropped with the selling price of the gasoline. They were

Average profits (without depreciation) per month

| | |
| --- | --- |
| January to May 31 | $8,296.09 |
| June, July, August | $2,598.03 |

---

[1] Fidelity-Phenix Fire Insurance Co. v. Benedict Coal Corp., 4 Cir., 64 F.2d 347.

It is obvious that with the succeeding still lower selling price of the gasoline of 6.084 cents per gallon, the profits in the suspension period in question well could be much less and, when depreciation is added to cost in determining profit, quite likely would disappear, even granting a ten percent raise in the plant's production in the three month period as claimed by insured.

Insured does not question these significant facts but insists that, in spite of them, its measure of damages is the average of the monthly profits computed by adding the higher profits of the first earlier months to the much lower profits of the last three months before the fire. It claims its right arises from the words "due consideration shall be given," in a policy provision that "In determining the amount of net profits * * * for the purpose of ascertaining the amount of loss sustained * * * due consideration shall be given to the experience of the business before the fire and the probable experience thereafter."

Common sense as well as the legal maxim that "Interpretation must be reasonable," California Civil Code § 3542, requires us to interpret the "due consideration" as "rational consideration." There is no rational relationship that business men would recognize in a suit upon a contract guaranteeing, say, certain profits on a plant built by one party for another, between profits of the five high sales price months from January to May 31 and those to be estimated for September, October and November, when the sales price had such a heavy drop.

■■ It is true that where the provisions of an insurance policy are subject to two or more interpretations, that which is adverse to the insurance company must prevail. If the figures for the period from January 1 to August 31 had shown some continuous consistent monthly profit and no substantial variation of production cost and sales price, no doubt under the policy they would prevail over a profit estimate based upon a calculation of production cost and sales price during the ninety day period. However, if the arbitrary blending of the earlier five months and the last three months were allowable, because both were "the experience of the business before the fire," then, as well, could be added together and averaged an experience of a year's loss preceding the fire and an experience of large profits in the next preceding year. Such an arbitrary "consideration" of ex-

perience is not a rational or "due consideration."

■ The district court's opinion accepted the insured's contention. It makes no analysis of the experience and no mention of the uncontradicted facts above set forth, but stated "As stated before, the policy provides that in ascertaining the loss due consideration shall be given to the experience of the business before the fire. Even the expert witness for the defendant testified that the plaintiff operated at a profit for the total eight months prior to the fire * * *. I therefore find that the plaintiff did operate at a profit for the eight months previous to the fire and find such profits to be the sum of $49,274.54."

In determining the profits the district court refused to consider the figures of depreciation on the plant and machinery of a book value of around $250,000, of which the insured's own auditor witness testified

"Q. * * * When you were figuring it, [depreciation] taking the value of the plant as the basis, did you not also, in so figuring it, take an estimated time for the life of the plant? A. Yes.

"Q. Now, I am asking you what was that estimated time of the life of the plant that you so took? A. It was based on from 5 to 16 or perhaps 20 years. I couldn't say offhand without having my report where I worked up that comparison. Some parts of the plant will wear out in 5 years. Other parts, the tanks, for instance, would last 16⅔ years.

"Q. Did you take an average figure as representing the life of the plant in order to work it out on the basis of its valuation? A. I took the annual depreciation on each particular part of the plant—what the annual depreciation would be for the year, and after I had arrived at the total depreciation of all the different parts in the plant for the entire year, then I took a total of that. That gave me the total annual depreciation allowable under federal income tax laws. And then we based our depreciation on 10 cents per barrel throughout, which [figure of $26,843.43 or 10.73-plus percent per annum on a $250,000 gasoline plant] tied pretty close into the figure arrived at on a straight line depreciation method."

Instead, the district court accepted a figure of $3,034.99 for the eight months before the fire. This is at the rate of but 1.84 percent per annum on the $250,000—

an astonishing figure for a plant of intricate machinery and processes—the longest item, its housing, having a 20-year life, and its "tanks on one side, process equipment on the other, boilers and so forth," with lives of 5, 16 and 16⅔ years. Instead, at 1.84 percent, the average life of all the machinery and its housing is over 54 years.

No analysis of the 1.84 per cent result is given. It rests upon a mere feeling of the witness Devere that it was offered because "we felt that that represented the true depreciation for the first eight months. There was considerable depreciation of material values, and we felt that that properly and correctly reflected the actual depreciation in the plant during that period." However, on cross-examination, he testified in detail regarding the figure of $26,843 or 10.73-plus percent, the depreciation for the year for the plant shown on its books, that "We arrived at that figure originally by taking the total plant value and appraising the life of the individual unit parts of the plant; tanks on one side, process equipment on the other, boilers and so forth; and working out a composite annual figure in dollar and cents, and reduced that to the barrel basis anticipated on the average number of barrels to be run through the refinery."

We do not agree that what was merely "felt" by insured's president to be an amount of depreciation is sufficient to sustain a finding of a depreciation of 1.84 per cent on the $250,000 plant, when taken in consideration with his cross-examination on the subject and that of his auditor.

■ A polymerization plant was contracted to be built in the destroyed premises in the ninety-day period. It was proved that it could have been built and would have earned in net profits in that period the sum of $3,901.15. The insurer does not question this amount of loss of net profits, but claims that because the unit was not built no recovery can be had. We do not agree. The net profits insured were from the insured's business of manufacture of gasoline. The contract for the polymerization plant's installation and its operation was a part of the business of such manufacture. The loss of its use and occupancy prevented the profit. We can see no difference between profits flowing from a contracted capital investment in a plant structure to assist in making gasoline and the profits flowing from a contracted current investment in the mineral oil which is manufactured into gasoline. We agree with the district court's item of loss of $3,901.15, not contested by Insurer, for the loss of net profits for the polymerization plant. However, the loss insured against is for the total of the net profits lost during the 90-day period from all the operations from which there may be a profit. On a retrial, if there should be shown a net loss instead of a net profit from the operation of the destroyed plant, the total net loss of profit would be the $3,901.15 uncontested loss from the polymerization plant to be constructed, less such net loss from the destruction of the existing plant.

### The Insured's Appeal.

■ In addition to the net profits, the policy covered the actual loss sustained by reason of the ninety day suspension of the use and occupancy of the plant, consisting of "Item II. Fixed charges and expenses, only to the extent to which they would have been earned had no fire occurred, as follows: Salaries of indispensable employees, superintendents, executives and of employees under contract, taxes, interest, rents, royalties, insurance, premiums, advertising, special contracts, dues, subscriptions, directors' fees, accounting expenses, legal expenses and fees, all other fixed charges and expenses not including expenses, (if any) insured under Item III."

The insured appeals from an award of damages in the amount of $7,348.63. The district court arrived at this figure by dividing in half expenditures in the amount of $14,697.27. Concerning certain of these expenditures, the insured's brief admits "The trial court was of the opinion—and there is evidence to support his view—that some of the indispensable employees of the refining unit were used during the suspension period in plaintiff's sales organization, which continued operating during the suspension period. It does not appear, nor would it be possible to say from the figures in the transcript, what employees of the refining unit were made use of in the sales organization, nor is there any testimony in the record by which the value of such services to the sales organization, whether full or part time, could be ascertained. * * *"

Nowhere has the insured sustained its burden of showing the exact amount of the expenditures attributed to the suspension of the plant as distinguished from that

attributable to its business of the purchase and sale of gasoline produced by other refiners,—that is, the business not covered by the policy. Failing in this, there is no showing of prejudice in the amount awarded. On this ground we sustain the award of $7,348.63.

■ The insured claims that it should have been awarded the larger sum of $37,672.21, the amount claimed in its proof of loss, because of the failure of the insurer properly to express its disagreement with the items of the proof of loss. The policy provision is that within a certain period "the Company shall notify the insured in writing of [a] its partial or total disagreement with the amount of loss claimed by him and shall also notify him in writing of the [b] amount of loss, if any, the Company admits on each of the different articles or properties set forth in the preliminary proof or amendments thereto."

Insured served on the insurer its proof of loss with various items of loss which it claimed were caused by the suspension of the use and occupancy of the plant. As to the requirement [a] in the above-quoted matter, the insurer in due time notified the insured "You are hereby notified the undersigned totally disagrees with the amount of loss claimed by you in said Preliminary Proof of Loss. * * *" As to the requirement [b] "the amount of loss, if any, the Company admits on each of the different articles or properties," the insurer in due time responded in writing, as follows:

"You are hereby notified * * * the amount of loss which this company admits on each or all of the items described in said preliminary proof of loss is nothing.

"You are further notified that the undersigned does not admit that you suffered any loss on each or any of the different articles, or on each or any of the different properties set forth in said preliminary proof of loss."

Insured claims that instead of the single statement that insurer admits a liability of "nothing" on "each * * * of the items described in said preliminary proof of loss," it should have repeated each item of the proof and after each item repeated the statement that it admitted "nothing." We regard insured's contention as violative of the elementary axiom expressed in § 3532 of the California Civil Code as "The law neither does nor requires idle acts."

Insured relies upon Victoria Park Co. v. Continental Ins. Co., 39 Cal.App. 347, 178 P. 724, and Lauman v. Concordia Fire Insurance Co., 50 Cal.App. 609, 195 P. 951. In neither of the cases was there a statement of the insurance company that it admitted nothing as to each item in a proof of loss. We agree with the district court in not awarding as damages the larger amount claimed in the proof of loss because of the form of the refusal to admit liability.

■ The insured also claims that the district court should have awarded the larger amount of the proof of loss because the insurer failed to demand an appraisal under the policy provision that "If the insured and this Company fail to agree, in whole or in part, as to the amount of loss within ten days after such notification, this Company shall forthwith demand in writing an appraisement of the loss or part of loss as to which there is a disagreement and shall name a competent and disinterested appraiser, and the insured within five days after receipt of such demand and name, shall appoint a competent and disinterested appraiser and notify the Company thereof in writing, and the two so chosen shall before commencing the appraisement, select a competent and disinterested umpire."

No such ground of recovery is alleged in the complaint, which claims only that the failure to comply with the requirement with respect to the admission of liability for the items of the proof of loss required an award of the amount there shown, without further proof. Furthermore, at the opening of the trial, the insured's counsel, in response to an inquiry of the court as to whether the trial was to be "simply a question of the amount due," stated that there was the question "whether or not the defendant insurance company has made sufficient objection to a detailed proof of loss." Then followed

"The Court: No. But I mean if your position as to the sufficiency of their objection to your proof of loss, if the court should rule against you on that—

"Mr. Penney: That is right.

"The Court:—then it would be a question of the detailed determination as to the amount of your damages?

"Mr. Penney: That is correct."

There followed two days of trial in which no contention was made that the fail-

ure to appoint an appraiser entitled the insured to the entire $39,672.21 without any proof of the "actual loss sustained." Then came the district court's opinion showing that it based its award of damages on the evidence produced and its judgment awarding damages for but $30,323.57. We may assume that the insured "mended its hold" in its briefs to the district court, but we are of the opinion that the court properly disregarded the unpleaded claim, if valid, as waived by the statements and conduct of the insured. We are of the opinion also that the failure to demand an appraisal does not penalize the insurer by depriving it of its defenses under the policy. That instrument provides no such penalty.[1]

Insured relies on two California decisions, Old Sauselito L. & D. D. Co. v. Commercial Union Assur. Co., 66 Cal. 253, 5 P. 232, and Adams v. South British & Nat. Fire Ins. Co., 70 Cal. 198, 11 P. 627, 628. These decisions held that the insured had no right of action against the insurer until "a fair effort on the part of the insured" was made to procure the arbitration provided in the policy. In the instant case there is no question that the insured has the cause of action upon which it brought suit and in which it permitted, without objecting on the ground of failure to demand arbitration, the insurer's defenses that the losses were not those claimed in the proof of loss.

The portion of the judgment from which the insured appeals is affirmed. The judgment against the insurer so far as it awards damages for net profits is reversed and remanded for a new trial in which consideration shall be given to the matters decided in this opinion.

Affirmed in part and reversed in part.

STEPHENS, Circuit Judge.

I concur in the opinion other than in its discussion of depreciation. As to that I believe we have no occasion to hold that the trial court's findings as to depreciation are erroneous.

Upon Petition for Rehearing.

PER CURIAM.

We have affirmed the district court's judgment as to the amount recoverable by Pathfinder under part II of the policy providing for fixed charges.

Its petition for rehearing now, for the first time, claims that we should consider as to be included in fixed charges the item of depreciation, though it was not claimed in its complaint and it admits "was not mentioned" to the court below as an item of fixed charges. In answer to the petition, the Insurer contends that even if the Insured could so mend its hold, there was no depreciation in the 90-day period because there can be none on property which is destroyed, citing Fidelity-Phenix Fire Insurance Co. v. Benedict Coal Corp., 4 Cir., 64 F.2d 347, 353. To this the Insured replies that the premises were only partly destroyed. It is not clear to us, as claimed by the Insured, that the deduction of depreciation in determination of profits would just equal the amount added for depreciation to the fixed charges. We see no reason to consider the contention that the case should be reopened below on the ground of the Insured's negligence as to its claim below, presented for the first time after argument, submission and decision of the appeal.

The petition also points out that we have sustained the district court's item of award of $3,901.15 (an amount not contested here by the Insurer) on the issue of the claim of loss of net profits of the polymerization plant during the 90-day period in which it could have been constructed and operated. It contends that our decision that there be a retrial on the issue of net profits lost, may be construed as requiring a new trial as to the lost profits of the polymerization plant. This is but one of the items in determining the total loss of net profits during the 90-day period. The sentence beginning on line 5, page 7 of our opinion, as printed [145 F. 2d 371, column 2, line 2], is orded amended to read as follows:

"We agree with the district's item of loss of $3,901.15, not contested by Insurer, for the loss of net profits for the polymerization plant. However, the loss insured against is for the *total* of the net profits lost during the 90-day period from all the operations from which there may be a profit. On a retrial, if there should be shown a net loss instead of a net profit from the operation of the destroyed plant, the total net loss of profit would be the $3,901.15 uncontested

[1] Cf. Gratz v. Insurance Co. of North America, 282 Pa. 224, 127 A. 620; Penn. Plate Glass Co. v. Spring Garden Ins. Co., 189 Pa. 255, 42 A. 138, 69 Am.St.Rep. 810.

374

loss from the polymerization plant to be constructed, less such net loss from the destruction of the existing plant."

The petition for rehearing is denied.