**MANUFACTURERS MUTUAL FIRE IN-
SURANCE COMPANY, Plaintiff-
Appellee,**

v.

**ROYAL INDEMNITY COMPANY,
Defendant-Appellant.**

No. 72-2723.

United States Court of Appeals,
Ninth Circuit.

July 22, 1974.

As amended Aug. 2, 1974.

Rehearing Denied Aug. 14, 1974.

John B. Marchant (argued) of Sedg-
wick, Detert, Moran & Arnold, San
Francisco, Cal., for defendant-appellant.

Harding A. Orren (argued) of Robins,
Davis & Lyons, Minneapolis, Minn., for
plaintiff-appellee.

Before MERRILL and ELY, Circuit
Judges, and LINDBERG,* District
Judge.

### OPINION

MERRILL, Circuit Judge:

On September 9, 1965, Hurricane Bet-
sy struck the New Orleans area, causing
physical damage to plants and facilities
owned and operated by Kaiser Alumi-
num & Chemical Corporation at Chal-
mette, Gramercy, Baton Rouge, Norco
and New Orleans. As a result of this
physical damage, Kaiser suffered prop-
erty damage and business interruption
losses of approximately $8,400,000.

This diversity case concerns Kaiser's
facility at Chalmette, Louisiana, one of
the largest aluminum reduction plants in
the world. As a result of wind damage
caused by the hurricane, the aluminum
production facilities at the Chalmette
Plant were without electric power from
10 p.m. on September 9, 1965, until

---

* Honorable William J. Lindberg, Senior Unit-
ed States District Judge for the Western

District of Washington, sitting by designa-
tion.

11:25 a.m. on September 11, 1965, during which period of 37 hours the molten metal in the reduction potlines solidified ("froze"). Aluminum production was not resumed until September 17, 1965, and full production was not obtained until several months thereafter. This resulted in a loss of production of 30,217,936 pounds of aluminum and a loss of profits of $3,979,913.27.

This case involves the insurance coverage afforded Kaiser for this loss of profits under a Physical Damage and Business Interruption policy issued by plaintiff and appellee, Manufacturers Mutual Fire Insurance Company, and a Boiler and Machinery policy issued by defendant and appellant, Royal Indemnity Company. Both policies afforded Kaiser insurance against the loss sustained due to interruptions of business as a result of *on-premises* physical damage caused by the peril insured against. In addition, Royal, by its Endorsement 8, extended its coverage to include business interruption losses arising out of a deprivation of power when caused by *off-premises* occurrences. Both policies contained an "idle period" clause to the effect that the insurer should not be liable for "loss with respect to any period during which goods would not have been produced or business operations or services maintained had no fire or other peril insured against occurred."

Here Kaiser suffered on-premises damages to electrical transmission lines and distribution equipment that resulted in total shutdown of Kaiser's on-premises power plant and total interruption of delivery of electrical energy to the aluminum reduction potlines. Within four to eight hours thereafter the pots solidified. On-premises damage unquestionably was the direct cause of the business interruption loss. United Gas Pipeline Co. supplied Kaiser with natural gas from off-premises sources, which gas was used by Kaiser to generate electricity through its on-premises power plant. Kaiser's normal requirement was 143,000 mcf. The record contains testimony to the effect that as a result of

the hurricane about 74 per cent. of United's available gas supply was cut off; that had Kaiser made a request for power the day following the hurricane United could have delivered up to 15,000 mcf and no more.

The dispute is as to the manner in which liability for the loss should be apportioned between the two companies. The recognized practice of the insurance industry where there is overlapping coverage is to ascertain whether, beyond the area of common coverage, there is an area where separate coverage is afforded by a policy. If so, then the company affording separate coverage must first respond to that loss which it alone covers; the remainder of its limit of liability then contributes to the loss commonly covered.

The problem facing the District Court was how to give effect to this principle as well as to the "idle period" clauses of the policies and to Royal's Endorsement 8 coverage of off-premises damage under the facts of this case. Its solution, over the protest of Royal, was to make findings on the following hypothetical questions:

(a) Assuming that the Kaiser plant had suffered no on-premises wind damage, had continued to operate, and had continued to require its normal supply of natural gas (143,000 mcf), how much gas could United have supplied Kaiser on September 10 and September 11, 1965—the first two days following the hurricane?

(b) In the event that under this hypothetical set of facts United could not have supplied Kaiser with its full normal requirements on those two days, what hypothetical loss of profits would Kaiser have suffered?

Upon these questions the court found that United could have delivered only 15,000 mcf of gas to Kaiser on the two days following the hurricane; that the hypothetical loss suffered by Kaiser due to this reduction in supply was $2,855,052; that Royal's Endorsement 8 provided separate coverage for this hy-

pothetical loss of profits. Judgment against Royal was entered accordingly.[1]

Royal contends here, as it did below, that the issue of a hypothetical gas deprivation was irrelevant to the determination of the separate coverage afforded Kaiser by Endorsement 8. Royal urged the trial court, and urges us, to base this determination on the actual undisputed facts of the Kaiser loss. Since it was undisputed that the freeze-up of the potlines (the interruption of business giving rise to the loss) was the result of on-premises physical damage caused by the hurricane and was neither caused nor contributed to by any lack of incoming gas and electricity from off-premises sources, Royal contends that the trial court should have found as matter of law that there was no separate coverage under Endorsement 8. Royal summarizes its position by asserting that insurance policies are designed to cover actual, rather than hypothetical, losses and that it was error to impose liability under Endorsement 8 for a loss that in fact never was suffered.[2]

We do not, however, interpret in this fashion the action taken by the District Court.

As we view it, liability was imposed on both companies for the loss that actually *was* suffered—that resulting from the *on-premises* damage. Both policies, however, contained an "idle period" clause which provided for an exemption from this liability. It is this clause that required the court to indulge in hypotheses. Under the clause the court was required to hypothesize a situation in which no damage had been suffered by on-premises facilities. If, in that hypothetical situation, there was a period when (for reasons other than on-premises damage) goods would not have been produced or operations and services maintained, then, as to that hypothetically "idle" period there was no liability. The court found that there was such a period[3] and that the exemption accordingly became effective.

While Manufacturers received the benefit of this exemption, Royal's Endorsement 8 precluded Royal from enjoying it, since the endorsement provided coverage for the very risk that hypothetically had created the "idle period." If we accept the hypothesis that makes the exemption effective, we must in turn extend that hypothesis to Endorsement 8. Assuming that off-premises damage would have "idled" the Kaiser plant, then Royal is, by the same assumption, liable under Endorsement 8.

It is not Endorsement 8, then, that imposes liability by hypothesis. Endorsement 8 precludes escape from liability elsewhere imposed where that escape is founded upon a factual hypothesis under which Royal would nevertheless remain liable.

Accordingly we find no error in the District Court's resort to hypothesis.

Royal protests that the court's findings upon the hypothetical questions are clearly erroneous. It asserts that the record, when properly read, establishes that United could have provided Kaiser with its minimum requirements without interruption. It may indeed be read to

1. Pursuant to a written agreement between Manufacturers and Royal, the parties each paid Kaiser 50 per cent of its total loss of profits of $3,979,913.27 in consideration of a full release from Kaiser. Manufacturers reserved the right to bring suit against Royal to recover $1,427,526.00 (50% of $2,855,052.00), being that portion of its payment to Kaiser which it contended was an off-premises loss payable under Endorsement 8 of the Royal policy. Judgment was for this amount.

2. This view is echoed by Judge Ely in his dissenting opinion, *infra*. Respecting that opinion we note that when Judge Ely's burned out factory collapsed into the earthquake fault the idle period clause did not eliminate recovery for fire damage. It simply served to attribute loss of earnings to the earthquake.

3. The "idle period" coincided with the actual period of nonoperation. It applied, however, only to seven out of the nine potlines that froze. As to two of the potlines, United could have provided the necessary power.

provide support for that contention, but it can also be read to support the findings of the District Court.

Royal protests that the actual facts render the hypothesis absurd since the on-premises facilities could not possibly have escaped damage from Hurricane Betsy; that the "idle period" clause should not be given effect under these circumstances. The clause, however, allows for no exception to its application.

Judgment affirmed.

ELY, Circuit Judge (dissenting):

It is a fundamental principle of insurance law, now fixed by California statute, that an insurer cannot be held liable unless the insured's loss is proximately caused by the peril or hazard insured against. California Code of Insurance § 530. Here, however, the majority ignores this principle in order to hold Royal Indemnity (hereinafter Royal) liable for the hypothetical damages of a hazard which occurred but was not the cause of any loss to the insured.

Royal and Manufacturers Mutual (hereinafter Manufacturers) both insured Kaiser against loss of profits caused by on-premises physical damage. Both companies also included idle period clauses in their policies, providing that profits which would have been lost "in the absence of the hazard insured against" were thereby excluded from coverage. Royal, in addition to its on-premises physical damage insurance, also insured Kaiser against loss of profits caused by the interruption of off-premises power. At trial Manufacturers argued that in order to give effect to its idle period clause, the Court must consider what losses Kaiser would have sustained had there been no on-premises physical damage.[1] If there had been no on-premises physical damage, Manufacturers contended that there would have been substantial profits lost by Kaiser as a result of the interruption of the off-premises power supply. Therefore, according to Manufacturers, the idle period clause requires that those profits that would have been lost as a result of the interruption in off-premises power must be deducted from the actual profits lost as a result of the on-premises physical damage. The trial court, in agreeing with Manufacturers' position, held Royal liable for the losses that would have occurred from the interruption in off-premises power, assuming there had been no prior damage to Kaiser's plant and equipment. Royal was thus required to pay for seven-ninths of Kaiser's damage, despite the fact that Kaiser's loss was actually caused by a contingency (on-premises physical damage) against which both companies had insured. This is not fair.

While the majority apparently recognizes the general rule that the cost of indemnifying a loss commonly covered is shared equally by the two insurance companies up to the limit of each company's coverage, it has nonetheless upheld the District Court's decision. The basis for the majority's decision is its literal interpretation of Manufacturers' idle period clause.[2] In their view the clause operates to eliminate from common coverage an amount equal to the damage that Kaiser would have suffered from the off-premises power failure if the plant had not already been disabled by

---

[1]. Manufacturers' idle period clause stated: "This Company shall not be liable for

. . . .

"4. Loss with respect to any period during which goods would not have been produced or business operation or services maintained had no fire or other peril insured against occurred."

Manufacturers' policy also insured Kaiser against " . . . the actual loss sustained . . . due to interruption of business as a result of [on premises] physical damage caused directly by the perils insured against hereunder . . . ." (Emphasis added.) (One of the "perils insured against" was "direct action of wind".)

[2]. While there was conflicting testimony offered by the insurance companies as to the meaning of the clause, I view the interpretation of the policy's unambiguous language as a legal question rather than a factual question.

on-premises damage. This literal interpretation violates the basic principle, heretofore emphasized, that an insured risk must cause actual damage before liability can be imposed. The majority's error, I think, stems from its failure to take into account the purpose of the clause in the context of business interruption insurance.

"[Business interruption insurance] may be generally described as a form of insurance designed to indemnify the insured against losses arising from his inability to continue the normal operation and functions of his business, industry, or other commercial establishment or, in other words, the total or partial suspension of such business, due to the loss, or loss of use of, or damage to all or part of the buildings, plant, machinery, equipment, or other physical assets thereof, as a result of a peril or hazard insured against."

Annot., 83 A.L.R.2d 885, 890 (1962). *See also* Pacific Coast Engineering Co. v. St. Paul Fire & Marine Insurance Co., 9 Cal.App.3d 270, 88 Cal.Rptr. 122 (1970); 1 Couch on Insurance (2d ed.) § 1.108, p. 102, § 1.125, p. 53. Obviously, the risk against which the policyholder was insured must be the proximate cause of the loss in order for liability to accrue to the insurance company. And if other hazards coincidentally occur, but cause no damage, the idle period clause does not eliminate from coverage any part of the actual loss. *See* Rogers v. American Insurance Co., 338 F.2d 240 (8th Cir. 1964); General Insurance Co. v. Pathfinder Petroleum Company, 145 F.2d 368 (9th Cir. 1944). But the majority has interpreted the idle period clause to achieve exactly that result—e. g., liability for losses actually caused by one hazard (on-premises damage due to loss of on-premises power) is shifted to Royal which insured against a different hazard (off-premises power failure) that occurred coincidentally but caused no damage.

Idle period clauses have typically been used to eliminate from coverage any losses caused by concurrent or intervening hazards. For example, if an insured's plant is burned to the ground after all its employees have gone on strike, an idle period clause would prevent the insured from recovering his usual business profits. He could only recover the amount of profits he would have made while the strike existed. And if an uninsured risk adds to the damage suffered by the insured, the idle period clause operates to prevent recovery for additional losses. For example, if a fire shuts down a plant for ten days, but it doesn't reopen for fifteen days due to a strike at the same time, the insured is entitled to business profits during the time his plant was shut down because of the fire, but not for the additional time it was shut down due to the strike. Business interruption insurance reimburses the insured for the period of time that his business was idle due to the insured hazard, and the idle period clause limits the insured's recovery to the amount he actually lost rather than his usual business profits for that period. While it may be argued that under this interpretation the idle period clause is only "boilerplate", past decisions indicate that such "boilerplate" was intended to prevent insured parties from recovering larger damages than those actually suffered. In Eisenson v. Home Ins. Co., 84 F.Supp. 41 (D.C.Fla. 1949) the court awarded the insured recovery for prevented net profits on the basis of net profits for the twelve months preceding the fire for which it was insured, notwithstanding that the business had operated at a loss for several months immediately before the fire due to the cancellation of a large contract and would have continued to operate at a net loss. And in General Insurance Co. v. Pathfinder Petroleum, *supra*, our court held that when the insured had been in business for eight months during the first five of which profits were high, but during the last three of which profits were much lower and would have been lower still during the period of business interruption, recovery

should be based on an average of the profits over the entire prior eight months. *See* Annot., 83 A.L.R.2d 885, 906 (1962).

Interpreting the idle period clause as a limitation to prevent greater than actual recoveries by the insured avoids the majority anomalous result whereby liability is imposed when there has been no actual damage from the insured risk. Furthermore, an interpretation of the clause in light of its purpose, unlike the majority's literal interpretation, is consistent with other fundamental principles of insurance law, such as: (1) policies should be interpreted in light of the purposes for which they are presumably made, i. e., the courts should consider what losses the insured was attempting to protect himself against; (2) the reasonable expectations of the parties should be carried out, i. e., did the insured expect that if he insured himself from fire, and the fire occurred, that the simultaneous occurrence of an earthquake would allow the company insuring against business interruptions caused by fires to escape liability; (3) when it is possible to give two meanings to language the meaning most favorable to the insured should be adopted. In the instant case, the importance of the latter principles are minimized because our case does not involve a suit between an insured and his insurance company, but between two insurance companies. But in the next case between the insured and the insurance company the majority's holding will compel the following bizarre result: If a plant, insured for fire, is burned to the ground, and five seconds later the charred remains fall into a pit caused by an earthquake, for which the plant was not insured, then the idle period clause operates to eliminate the insurance company's liability. The company can successfully argue, after this decision, that if there had been no fire, there still would have been an earthquake five seconds later, so the insured can only recover what the business would have earned in the next five seconds. This will result in allowing the carrier to avoid liability for losses that it insured—loss of profits due to fire. Since the fire occurred first and was the proximate cause of the damage, the insured should be able to recover notwithstanding that an earthquake occurred later, causing no further damage. Of course, if the earthquake in some way added to the actual damage suffered by the insured, for example, by extending the time required to rebuild the plant, the idle period clause should properly eliminate the additional damage from the company's liability. But the majority's result will require that the insurance company be relieved from liability in the above example. That result is completely contrary to the existing principles of insurance law.

In our case Kaiser insured itself against business interruptions caused by two different contingencies—damages caused by the loss of off-premises power (insured by Royal) and damages caused by the loss of on-premises power (insured by both Royal and Manufacturers). Both of these contingencies occurred, but only one caused damage to Kaiser. At the time the off-premises power was reduced, Kaiser was already shut down, damaged and disabled from the earlier loss of on-premises power, and the loss of off-premises power did not in any way extend or enlarge the period of business interruption (the damage). If the loss of off-premises power had added to the damage caused by the loss of on-premises power, then Royal would be liable for that additional amount of damages caused by the loss of off-premises power. But to hold Royal liable for the loss to Kaiser of off-premises power that Kaiser could not use because of prior on-premises damage violates the basic concept of insurance law that there is liability only where the hazard caused damage. The majority's decision ignores all traditional principles of insurance law and, at the same time, works an injustice with which I cannot associate myself. I would reverse.