**EASTERN ASSOCIATED COAL CORP.**

v.

**AETNA CASUALTY & SURETY CO.**

Civ. A. No. 75–855.

United States District Court,
W. D. Pennsylvania.

Aug. 22, 1979.

---

Raymond G. Hasley, Pittsburgh, Pa., for plaintiff.

Samuel P. Gerace, Pittsburgh, Pa., Stuart Cotton, New York City, for defendant.

## OPINION

KNOX, District Judge.

Plaintiff, Eastern Associated Coal Corporation, a corporation incorporated under the laws of West Virginia with its principal

office in that state but also qualified to do business in Pennsylvania with offices in Pittsburgh, has brought suit against Aetna Casualty and Surety Company and certain other insurance carriers including underwriters at Lloyds of London subscribing to policy No. 2080712 to recover on an insurance contract containing a clause insuring against business interruptions. The defendants are all citizens of states other than West Virginia or Pennsylvania or a foreign country and hence there is complete diversity of citizenship between the parties. The case was tried to a jury, which after 10 days of trial and lengthy deliberations returned a verdict in favor of the plaintiff in the amount of $4,736,377 allocated among the defendants in accordance with agreed upon percentages. At the trial, the plaintiff had claimed a total amount of damages of $4,952,000. The question of interest was reserved at the time of trial for determination by the court after verdict.

The defendant has filed the usual motions for judgment NOV and for a new trial. Both matters have been thoroughly argued and briefed and are now before the court for decision.

The plaintiff is engaged in the business of mining and supplying both metallurgical coal which is used in steel plants in the making of steel, and so-called steam coal which is largely sold to power plants for use in their boilers. Metallurgical coal is required to have a sulphur content substantially below that of steam coal.

We are concerned here with a loss claimed by the plaintiff to result from interruption of its business in the Joanne Mine located near Rachel, West Virginia, by a fire which occurred January 14, 1974. At that time, the evidence shows that a fire broke out in the underground part of the mine, efforts to stop it were unsuccessful, and the mine was closed off and sealed for a period of about one year until June 1974. We are only concerned here under the policy with the period of one year after the fire. It appears, however, that considerable work was necessary to return the mine to active production. Production was resumed on a limited basis in late December 1974.

The insurance with which we are concerned here involves various fire and casualty policies issued by numerous insurance companies. The policies were originally purchased through insurance agents in package policies issued in 1972 which insured against damage by fire to plaintiff's real and personal property and also against damages resulting from interruption of its business. The annual premium was $44,417. The policies were issued in four layers. The first layer, subject to a $500,000 deductible covered losses up to $5,000,000 or a net of $4,500,00 after applying the deductible. The second layer with which we are concerned in this case insured losses over $5,000,000 up to $10,000,000. The third and fourth layers with which we are not concerned covered losses in excess of $10,000,-000 and $15,000,000 respectively.

The insurers involved in the first layer of coverage for the $5,000,000, less the $500,-000 deductible paid plaintiff the full amount of $4,500,000 due on that layer. It appears, however, that defendants admit that there was an excess of $287,277 over and above the $5,000,000 which would be due from the second layer of insurance regardless of the outcome of the other issues. While there was some dispute about this at the time of trial, it appears there was no serious dispute as to this matter and it was dropped at argument.

The business interruption clauses of the policy insured the defendants against, *inter alia*, "loss of earnings". In paragraph 10 with respect to this matter, it was specifically provided as follows:

"b. *Business Interruption*—Recovery in the event of loss hereunder shall be the ACTUAL LOSS SUSTAINED by the Assured directly resulting from such interruption of business, but not exceeding the reduction in earnings less charges and expenses which do not necessarily continue during the interruption of business, . . . Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume opera-

tions of the Assured with the same quality of service which existed immediately preceding the loss.

"EARNINGS DEFINED: For the purpose of this insurance 'Earnings' are defined as the sum of: (a) Total net sales value of production,

\* \* \* \* \* \*

(c) Other earnings derived from operation of the business, *less the direct cost of*:

(1) Raw Stock from which such production is derived;

(2) Merchandise sold, including packaging materials therefor;

(3) Materials and supplies consumed directly in service(s) sold; and

(4) Service(s) purchased from outsiders (not employees of the Assured) for resale which do not continue under contract.

No other costs shall be deducted in determining 'Earnings'. In determining 'Earnings', due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.

"EXPENSES INCURRED TO REDUCE LOSS: Any and all expenses incurred by the Assured to reduce loss hereunder is covered by this insurance to the extent only of the loss which would have been sustained had such expense not been incurred."

The evidence further shows that during the year following the fire there was an unprecedented demand for both high volatile metallurgical coal and steam coal of the types produced in the Joanne Mine, this being the first so-called energy crisis experienced in this country. It was estimated that the mine would have produced during the year following the fire 181,742 tons of metallurgical coal and 433,917 tons of steam coal.

Prior to the fire, metallurgical coal was under contract for sale to Sharon Steel Corporation under a ten-year coal supply agreement dated June 18, 1969, which pro-vided for payment at $7.25 per ton f. o. b. for metallurgical coal subject to escalation for various reasons. At the time of the fire the price for this coal was $13.34 per ton which was substantially lower than the market price. Steam coal from the mine had been sold largely to Ontario Hydro-Electric Power.

Under the contract with Sharon Steel, Sharon was not required to buy any minimum tonnage of Eastern's metallurgical production but, except for one year, Sharon had taken all the metallurgical coal from this mine.

Following the fire, Eastern claimed it was excused from supplying coal to Sharon under a *force majeure* clause contained in the contract providing for excuses in cases of strikes, labor shortages, fires, floodings or accidents at the mine or other matters beyond the control of the seller. A suit was instituted in the Court of Common Pleas of Allegheny County, Pennsylvania, by Sharon to compel compliance with the contract by the defendant but the arbitration went against plaintiff. Provision had been made for the supply of substitute coal from plaintiff's Wharton No. 4 Mine, also located in West Virginia, but after the fire no coal was available from this mine because the coal from Wharton No. 4 was contractually committed to other customers. The arbitrators held that the *force majeure* clause did not excuse plaintiff's failure to supply coal to Sharon, holding that by reason of a certain other clause in the contract, plaintiff had an obligation to supply Sharon's requirements from other sources in the event of deficiencies at the Joanne Mine. The arbitrators therefore held that Eastern must supply the deficiency from its Wharton No. 4 Mine, which proved impossible, or otherwise it must arrange for the supply to Sharon of other high volatile coal of a quality and at a price acceptable to Sharon. As a result of the arbitration award, plaintiff was required to go into the open market at a time of skyrocketing prices and obtain and supply to Sharon other high volatile metallurgical coal in order to comply with its obligations under the contract. It is this

loss which Eastern sustained in the year following the fire which is the main subject of contention in this case.

### (A) The motion.

Defendants have filed a motion for judgment NOV or for New Trial with the grounds for the latter not stated with any degree of particularity.[1]

It will be noted that the reasons given for a new trial are the grounds stated in defendant's motion for directed verdict and all other grounds that may be revealed after a study of the record.

We will, of course, consider the motion for judgment NOV but point out we cannot grant a judgment for the defendant in view of the fact that liability in the amount of $287,277, while subject to some denials at trial, was generally admitted and is specifically admitted in defendant's brief filed in conjunction with these motions. We will, however, consider plaintiff's right to recovery in general to amounts over $287,277.

With respect to the motion for new trial, under Rule 7(b) it is provided that the motion shall be in writing and shall state with particularity the grounds therefor. It has been held that these requirements are mandatory. *U. S. v. 64.88 Acres of Land*, 25 F.R.D. 88 (3d Cir. 1960). The court has, however, examined the grounds stated in the brief for granting a new trial and finds them to be without merit. We do find, however, that an item of damage which cannot legally be claimed by the plaintiff under this record has crept into the case and requires the court to order that the judgment be reduced.

### (B) Motion for Judgment NOV.

As previously noted we are unable to grant a complete judgment NOV for the defendants because there is presently no contest with respect to the item of $287,277. We will however consider the other matters raised therein. These matters generally were previously considered by the court in defendant's motion for summary judgment which was decided adversely against them in a memorandum opinion filed October 18, 1977 and the court adheres to what was said therein. As is noted, this case is really not a controversy over liability but rather a controversy over the amount of plaintiff's damages and it was held this amount had to be determined by the jury.

We have previously noted that the law requires the policy to be construed most strongly against the insurers. *Nusbaum v. Hartford Fire Ins. Co.*, 285 Pa. 332, 132 A. 177 (1926); *Philadelphia Mfg. Insurance Co. v. Rose*, 368 Pa. 363, 81 A.2d 566 (1951) and *Sehon Stevenson & Co. v. Buckeye Ins. Co.*, 298 F.Supp. 1168 (S.D.W.Va.1969). The laws of both West Virginia and Pennsylvania appear to be in accord on this. It was pointed out that the general rule as laid down by the courts is that business interruption insurance policies are intended to return the insured the amount of profit which it would have earned had the destruction by fire or other casualty not intervened. It is also true, of course, that expenses derived from events not related to the fire or other casualty are not covered. See opinion of Snyder, D. J. of this court, in *PPG Industries v. Appalachian Ins. Co.*, Civ-

---

1. "Defendants move the court to set aside the verdict entered in the above entitled action on the 19th day of December, 1978, and the judgment entered thereon on the 20th day of December, 1978, and to enter judgment in accordance with defendants' motion for directed verdict made during trial. In the alternative, defendants move this court for an order granting a new trial on the grounds stated in defendants' motion for directed verdict and all other grounds that may be revealed after a study of the record.

   "Defendants' motion for the directed verdict should have been granted because the claims asserted by plaintiff were, as a matter of law, not covered by defendants' policies of insurance and, further, because the evidence in the case did not establish plaintiff's claims nor the fact that defendants were liable for any portion of said claims.

   "Further, that said verdict and judgment were contrary to the law and facts in the case. Defendants further move for a directed verdict that plaintiff is not entitled to recover from defendants any sums in excess of $287,277 on the ground that defendants' maximum liability under the contracts of insurance issued by them cannot exceed said sum."

il Action No. 77–90, opinion filed March 26, 1979. On the other hand, the courts have given a broad interpretation to coverage under business interruption. The policy commenced, in Paragraph 3(b), to state that it insures against loss of earnings as defined herein resulting from damage to or destruction of property of the insured during the terms of this policy. Specifically with respect to business interruption it says it shall be the ACTUAL LOSS SUSTAINED by the assured directly resulting from interruption of business but not exceeding reduction in earnings. It is further noted that in the last paragraph of the business interruption clause it is stated, "Expenses Incurred to Reduce Loss: any and all expense incurred by the assured to reduce loss hereunder is covered by this insurance to the extent only of the loss which would have been sustained had such expense not been incurred.

The courts generally have held that losses of the type under consideration here are covered by such business interruption clause. It is obvious from the testimony here that the fire at the Joanne Mine was one of the risks covered and that the business of the plaintiff was completely interrupted for over a year, the maximum period covered by the policy.

The court quoted to the jury the general rule as laid down in *National Union Fire Insurance Co. v. Anderson Pritchard Oil Corp.,* 141 F.2d 443 (10th Cir. 1944) where the court said:

"In other words, the policy is designed to do for the insured in the event of business interruption caused by fire, just what the business itself would have done if no interruption had occurred . . . no more."

In *Fidelity Phoenix Fire Insurance Co. v. Benedict Coal Corp.,* 64 F.2d 347 (CCA 4th 1933), it was held that loss of profits on rental of miners' houses in operation of a commissary were properly considered where the head house tipple and conveyor belt of the mine were destroyed by fire.

Also, in *General Ins. Co. v. Pathfinder Petroleum Co.,* 145 F.2d 368 (CCA 9th 1944),

it was held that loss from a plant yet to be built could be recovered and profit flowing from a contracted capital investment were included in business interruption insurance coverage.

The Pennsylvania courts have specifically held that expenses incurred by virtue of a contract as a result of a fire must be included. This case, which is very close to ours, is *Supermarkets Operating Co. v. Arkwright Mutual Ins. Co.,* 257 F.Supp. 273 (E.D.Pa. 1966). The case involved an express covenant to pay rent notwithstanding destruction of the building by fire and that this obligation to continue to pay rent should be considered as an expense continuing after the fire and covered by business interruption.

It should also be noted that while generally the construction of an insurance policy is for the court, nevertheless, where there are words similar to those involved in this policy, the matter should be left to the jury. *Nusbaum v. Hartford Fire Ins. Co.,* supra, where the court said:

"As to the contention that plaintiff's loss of profits was caused by the increased cost of production and the decrease in selling price and not by fire, it is sufficient to say that the argument made in support of it has not convinced us that this question was not properly left by the court to the jury."

See also *Heller v. Royal Ins. Co.,* 177 Pa. 262, 35 A. 726 and holding of the Judicial Committee of the Privy Council in *Mt. Royal Assurance Co. v. Cameron Lumber Co. Ltd.,* British Appeals cases 1934, p. 313.

The defendant relies most strongly on the decision of the Supreme Court of Wisconsin in *Goetz v. Hartford Fire Ins. Co.,* 193 Wis. 638, 215 N.W. 440 (1927). As pointed out by the plaintiff, this case is actually in support of plaintiff's theory because the court said:

"It is clear that the policy is not to indemnify against liability necessarily incurred during such suspension period. In order therefore that a liability incurred during such period shall be within the

indemnity, it is necessary to show that but for the fire the insured could have made or obtained the wherewithal to meet such particular liability. Otherwise, it has sustained no actual loss."

This is in accord with the situation here since the insured did show that but for the fire it would have supplied Sharon Steel Corporation with a certain amount, viz: 181,000 tons of metallurgical coal and as a result of the fire it had to go out on the open market and cover or else supply substitute coal from other mines which could have been sold elsewhere at a much higher price.

■ It should be noted that when the case was referred to arbitration by the court of common pleas, the defendants were given notice of the pendency of the arbitration and an opportunity to defend the case. This they did not do but instead ignored the state suit and the arbitration proceedings. Under these circumstances as the court told the jury, this court is bound by the decisions of the state court and the arbitration award and the jury was not to inquire into the terms of the same. See page 1219 where the court was told that:

"It is not for us to inquire into the wisdom or correctness of the arbitrator's award. That was the agreement of the parties that such disputes were to go there."

They are a matter which was before the court under whose jurisdiction the arbitrators function and that is the end of the matter. In other words we are bound by the arbitration award.

■ It was further pointed out that the question before the jury was whether they believed plaintiff's testimony and they could find that the purchases were not necessary or the prices alleged were not correct. But if they found that they were, they would be entitled to consider this as covered by the policy, that is, as expenses incurred to reduce the loss because if the plaintiff had not reduced the loss by compliance with the arbitrator's award and not carried out the contract, they might have been subjected to much greater damage

suits by Sharon Steel and orders of the court to enforce the arbitrator's award. It was, of course, pointed out to the jury that the policy provided that due consideration was to be given certain matters of expense and that was a matter for them to decide. The jury heard the very complicated testimony over a period of eleven days. They did not accept all of plaintiff's figures and arguments. Instead of allowing the claim in full in the amount of $4,952,000, the same was reduced by over $200,000 to $4,706,377. As will be discussed later in this opinion, the court determines that a portion of this amount, to wit: the sum of $890,744 is not sustained by the evidence and is based upon a speculative element introduced into the damages at the last moment and the judgment as entered upon the verdict will be reduced by that amount. Otherwise, the motion for judgment NOV will be denied.

(C) Motion for New Trial.

As we have previously stated, the motion for new trial does not specify any particular grounds therefor but in briefs and in argument a number of reasons were raised and argued. This is not sufficient because under Rule 7(b) as pointed out, the grounds must be stated with some degree of particularity in the motion.

Regardless of this, the court has reviewed the reasons mentioned in defendants' brief as to why a new trial should be granted and the court finds that none of them have any particular merit.

■ Complaint is made of exclusion of expert testimony of witness Ron Rodda who was called to interpret the meaning of the insurance contract. This is not permitted. The interpretation of the insurance contract is a matter for the court. *Treasure Craft Jewelers Inc. v. Jefferson Ins. Co.*, 431 F.Supp. 1160 (E.D.Pa.1974) aff'd 583 F.2d 650 (3d Cir. 1978). There is nothing in Rule 702 which would allow an expert to interpret a legal document and substitute his judgment for that of the court. *Fiorentino v. Travellers Ins. Co.* (1978 Fire and Casualty cases) p. 1078, is not in point because

that involves a suit against an insurance agent for failure to provide liability insurance coverage.

The rejection of the government report as to the Joanne Mine is considered proper and it was excluded (Tr. p. 1094) as too remote and confusing to the jury under Rule 403.

The point of failure to instruct the jury on the interpretation of the policy is not well taken. The court at pages 1215–1220 summed up the provisions of the policy with respect to the amount to be recovered under business interruption insurance. Matters which were to be considered by the jury in dealing with the figures which had been submitted by the parties were dealt with, particularly the somewhat vague words "due consideration" (p. 1217) were defined for the jury and also the meaning of the words "EXPENSES INCURRED TO REDUCE LOSS". The theories of the parties were dealt with at length at the end of 1219. The jury was clearly instructed that if they believed plaintiff's testimony in this respect, they would be entitled to consider these losses on purchases of brokerage coal and substitute coal as covered by the policy. The court charged the jury that they appeared to be expenses incurred to reduce loss.

The court did not therefore leave the jury adrift without a rudder but dealt with the various items of expense as claimed by the plaintiff and defendant.

It appears from plaintiff's motion for new trial that they are complaining that the court did not direct a verdict one way or another, but as pointed out, the testimony on each side was conflicting and it was a matter for the jury to determine what was the actual loss sustained. Under no circumstances could the court have directed a verdict for the defendant in the face of these claims by the plaintiff. It appears that perhaps defendant is complaining that the court should have directed a verdict for the plaintiff in interpreting the policy but this the court refused to do and under the *Nusbaum* case, supra. The amounts were properly left to the jury.

(D) Reduction of Judgment.

In the tabulation of actual loss sustained under the second layer of insurance (p. Ex. 61) as testified to by Mr. Stefl, President of Eastern Associated Coal Corp. (See notes of testimony pp. 548–575) it appears that as a result of attempts to enhance losses made in the last ten days before trial, the questionable item of $890,744 (see p. 548) was injected into the calculation. This is based upon the speculative testimony that Sharon Steel would have rejected approximately 77,000 tons of Joanne coal with a sulphur content in excess of 1.6% which coal could then have been sold on the open market at an enhanced price. The plaintiff in its interrogatories had previously stated that the amount of Joanne coal which would have been sold to Sharon Steel to fulfill the contract would have been 181,742 tons and it is on this that the other figures in Exhibit 61 were based. It appears now, however, that he is claiming that 77,000 tons from Joanne Coal which were included in the 181,742 tons would have been rejected and hence available for sale on the open market.

The court has concluded that there is no legal evidence to support any such claim. The amount is included in P. Ex. 61 in the amount of $1,178,021 which is made up of the $890,744, plus the $287,277 which is admitted by the defendant. The court has combed the pleadings in this case, the pretrial narrative statements and the notes of the pretrial conference and nowhere is there found any reference to this theory. If the judgment is not reduced, the court is of the opinion that a new trial should be granted because of the injection of this item into the testimony, the verdict in such case having been based upon surprise to the defendant. In view, however, of the fact that the figures are definite and that the amount involved is $890,744, the court is of the opinion that the matter can be handled by a reduction of judgment pursuant to Rule 50(b), this being one of the grounds upon which a directed verdict was sought. In *Garfield Aniline Works v. Zendle* (CCA 3d 1930) 43 F.2d 537, it was held that in an

action on a contract where the excess amount can be readily ascertained this may be done instead of following the cumbersome route of the remittitur resulting possibly in a lengthy retrial of the whole case.

Another way to handle this, of course, would be to enter a remittitur requiring plaintiff to remit $890,744 of its verdict within a limited period of time following entry of this order in default whereof a new trial would be granted.

In view of the fact, however, that the figures are very clear as to the amount involved by injection of this speculative testimony into the record, there being no firm evidence upon which the jury could determine how much Joanne Coal which was never mined might have been rejected and no firm evidence but that in desperation Sharon Steel might have accepted metallurgical coal slightly in excess of the 1.6 sulphur content, the court determines that this item must be stricken from the judgment and the judgment reduced accordingly. We will therefore direct that the motion for Judgment NOV be granted to the extent of $890,744 which after deduction from the verdict figure of $4,736,377, will leave plaintiff with the judgment of $3,845,633 for which there is sound basis.

(E) Prejudgment Interest.

The item of prejudgment interest was not submitted to the jury but by agreement of counsel was reserved for the court. (See N.T. p. 1220) Following the verdict, the plaintiff submitted a motion for the court to fix interest asking at first only for interest on $2,175,260 from the date of filing of the complaint on July 11, 1975. Later, the plaintiff filed an amendment to the motion to fix interest requesting the amount of $1,115,700.95 from January 15, 1975, to December 19, 1978, or from such other dates as might be appropriate suggesting also May 1, 1975. The defendants naturally oppose any award for prejudgment interest.

Basically, we start with § 337(a) of the Restatement of the Law of Contracts which was adopted by the Pennsylvania Supreme Court in *Penneys v. Pennsylvania Railroad*

*Co.*, 408 Pa. 276, 183 A.2d 544 (1962) which reads as follows:

§ 337. When Interest is Recoverable as Damages. If the parties have not by contract determined otherwise, simple interest at the statutory legal rate is recoverable as damages for breach of contract as follows:

(a) Where the defendant commits a breach of a contract to pay a definite sum of money, or to render a performance the value of which in money is stated in the contract or is ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices of the subject matter, interest is allowed on the amount of the debt or money value from the time performance was due, after making all the deductions to which the defendant may be entitled.

\*     \*     \*     \*     \*     \*

Comment: b. Where performance is to be rendered on demand or on any other condition precedent, interest as damages will not begin until demand or until occurrence or excuse of the condition; the fact that action may sometimes be maintainable without first making a demand does not change this rule as to interest. If the action is itself held to be the necessary demand, interest will run from the bringing of the action. In cases where, either by agreement or by custom, there is a period of credit, definite or indefinite in extent, there will be no interest as damages until the period of credit is at an end.

Pennsylvania cases on the question of interest on amounts due under fire insurance policies are generally in accord. The basic case is *J. Purdy Cope Hotel Company v. Fidelity Phoenix Fire Insurance Co.*, 126 Pa.Super. 260, 191 A. 636 (1937) where appraisers were appointed to appraise the loss and the court held that interest would be due from the date of filing of the appraiser's findings. The court stated that this was in accord "with a long line of cases in this state dealing with the allowance of interest where money is payable by agreement between the parties and a time is

fixed for the payment of it and holding that this constitutes a contract to pay the money at the time fixed and to pay interest on it from a given day in case of failure to pay at that day".

The fact that there is a bona fide dispute as to the amount of the indebtedness is no bar to the granting of interest if the amount offered by the defendant falls short of the amount of the sum found to be due. *J. Purdy Cope Hotel Co.*, supra; *Interlake Inc. v. Erie Industrial Trucks Inc.*, 427 F.Supp. 1012 (W.D.Pa.1977). Defendant's references to unliquidated damages in cases involving such questions are inappropriate because in this case the damages were capable of being ascertained following the filing of a proof of loss in view of the established market prices of the subject matter viz: market prices of metallurgical coal and high sulphur coal.

See also summary of the law contained in *Samuels v. California Ins. Co.*, 192 Pa.Super. 484, 162 A.2d 48 (1960) citing *inter alia West Republic Mining Co. v. Jones & Laughlin*, 108 Pa. 55 at 69 (1884) holding that it is improper to submit the question of interest due under a contract to the jury and pointing out that the loss generally under fire insurance policies is payable 60 days after filing of proof of loss.

Here there were clauses providing for appraisal and/or arbitration but neither party has sought these remedies and hence they will be deemed waived.

Nor is there any provision in the policies for filing of proofs of loss and hence the usual rule of 60 days from proof of loss cannot be applied. We shall therefore allow interest from the date of demand which was April 21, 1975.

*Samuels*, supra, and *Western and Atlantic Pipe Line v. Home Ins. Co.*, 145 Pa. 346, 22 A. 665 are not apropos with respect to the question of denial of coverage in toto. The defendant here did not deny coverage in toto. As a matter of fact there was an offer to pay the amount of $287,277 which the court has found to be admitted in this case and as pointed out by the court in the memorandum opinion denying defendant's motion for summary judgment "this is really not a controversy over liability but a controversy over the amount of the plaintiff's damage". It was further stated that "the defendants concede the existence of the insurance policies insuring the plaintiff against business interruption losses and also concede that the fire took place and as a result thereof the business was interrupted for over a year". For this reason we will not apply the rules in the cases where there is a denial of coverage in toto but rather the cases which hold that interest is due from the time the money is due.

In the instant case the fire occurred January 14, 1974, and the period of business interruption for which the defendants would be liable was one year which expired January 14, 1975. Proofs of loss were filed April 21, 1975, which is the date of demand. Defendants cannot be asked to pay before they knew the amount demanded. Verdict was rendered on December 19, 1978. The amount of the recovery as reduced by this court in its opinion is $3,845,633. We will therefore allow interest on $3,845,633 from April 21, 1975. This amounts to therefore 3⅔ years of interest at 6% or a total of 22% which will be included in the judgment. The judgment, of course carries interest on the total amount as now entered from date of entry December 19, 1978.